**Hudson C. MILLAR, Jr., and James Jerdan Bullard, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION.**

No. 77-2040.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1981.

Decided May 20, 1983.

As Amended May 20, 1983.

---

B. Dwight Perry, with whom John R. Feore, Jr., Albert H. Turkus, and Noel C.R. Gunther, Washington, D.C., were on brief, for appellants.

Gregory M. Christopher, Counsel, F.C.C., with whom Robert R. Bruce, Gen. Counsel, F.C.C., and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for appellee.

Before ROBINSON, Chief Judge, McGOWAN, Senior Circuit Judge, and JOHNSON *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

This matter is before the court on appeal from a decision of the Federal Communications Commission (FCC). In a memorandum opinion and order issued November 4, 1977, the FCC rendered final the prior decision of its Review Board that appellants Hudson C. Millar, Jr., and Jerdan Bullard had been guilty of "strike" conduct in connection with a 1966 application for a permit to construct a new standard broadcast station in Sumiton, Alabama. The Review Board based its decision upon a *de novo* review of testimony adduced at hearings held four years earlier before a hearing examiner who retired without rendering an initial decision. The Review Board concluded that appellants had instigated the formation of Sumiton Broadcasting Company, Inc., and participated in the broadcast license application of that company, with the intent to block or impede a mutually exclusive application for a station in nearby Cullman, Alabama. The latter station would have offered competition to appellants' own Cullman station, WKUL. *Sumiton Broadcasting Co.,* 45 F.C.C.2d 933 (Rev. Bd.1974), *review denied in relevant part,* 66 F.C.C.2d 656 (1977). As a result, the FCC staff has deferred acting on appellants' applications for renewal and assignment of broadcast licenses for their radio stations in Florida and in Alabama.

Appellants raise a number of issues regarding the Commission's handling of this case. We affirm the Commission as to all of these, but discuss at length only two that are at the center of this case: whether the Commission's policy with regard to strike conduct was sufficiently clear when appellants acted in 1965 so that it may fairly be applied to them, and whether the agency was required to hold new hearings after the hearing examiner who heard and saw the witnesses retired.[1]

I

Mutually exclusive applications for authority to construct new radio stations broadcasting on a frequency of 1540 kHz. at Sumiton and Cullman, Alabama, were filed, respectively, by Sumiton Broadcasting Company, Inc., and Cullman Music Broad-

---

* Sitting by designation pursuant to 28 U.S.C. 292(a) (1976).

1. The other objections raised by appellants are briefly discussed in notes 8, 17, & 18 *infra.*

casting Company (Cullman Music). The Cullman Music application was tendered for filing with the Commission on May 26, 1965, and was returned for technical deficiencies on November 18, 1965.

Shortly after appellant Millar was informed of the initial filing of the Cullman Music application, he approached Dan Mitchell, one of the principals of Cullman Music, to discuss the application. The overall thrust of the conversation at that meeting is not disputed. During their meeting, Millar tried to interest Mitchell in buying WKUL, Millar's station in Cullman, or in investing in another proposed broadcast venture. When Mitchell rejected these overtures, Millar mentioned the possibility of bringing an economic injury protest and the amount of time and money such a procedure would cost each of them. Although Millar and Mitchell disagreed in their testimony over whether Millar's mention of an economic injury protest constituted "a threat"—the Review Board concluded that it did—there is no dispute that Millar raised the subject.

Admittedly concerned about the competition a new station would produce, Joint Appendix (J.A.) at 223, Millar subsequently discussed with his partner, appellant Bullard, various possibilities for improving the facilities of their station, including that of applying for a better frequency. Millar then asked his Washington consulting engineer to prepare a study of available frequencies in Cullman. Millar and Bullard concluded, however, that none of the available frequencies would improve their Cullman facilities. They apparently then investigated the possibility of opening stations in Birmingham, thirty-six miles away, or Su-

miton, twenty-eight miles away. They eventually decided Sumiton was too small for them, and that Birmingham already had too many stations.

During this time—before the Cullman Music application was returned in November 1965—Millar also visited several local residents who had written letters that were submitted with the Cullman application testifying, *inter alia,* to the projected economic growth of the area. Millar succeeded in persuading one of them to amend his views in a new letter to the Commission.

The day he learned the Cullman application had been returned, Millar spoke with his Washington communications counsel and asked whether it would be legal for appellants "[t]o use the frequency [themselves] or to give assistance to anybody else that wanted to use the frequency." J.A. at 196; *accord* J.A. at 201. In an affidavit, the attorney stated that he advised that, while a strike allegation might be made, none would be upheld on the basis of "the providing of assistance to a Sumiton group solely in the preparation of a 1540 kHz application." J.A. at 291.[2]

Three days later, Millar and Bullard approached Wayne Sims, a former employee of Millar's at WKUL who had long expressed an interest in applying for a license for a station. The three met and discussed the possibility of Sims constructing a new station in Sumiton, Alabama. Here, again, while some elements of the conversation are in dispute, the parties agree on certain crucial points. It is clear, at least, that Millar and Bullard suggested to Sims a plan for constructing a radio station in Sumiton;

---

2. Millar apparently recalled that the advice was that it would be proper for him "[t]o use the frequency myself or to give assistance to anybody else that wanted to use the frequency." J.A. àt 196. The Board found that the two versions were in conflict because Millar's suggested that it would be legal for appellants to instigate an application, while the attorney's suggested that assistance solely in preparation of an application would be legal. *Sumiton Broadcasting,* 45 F.C.C.2d at 964. Appellants argue that, fairly read, there is no conflict between the two versions. We tend to agree that

the Board's finding of a conflict between the two on this point is probably an overly subtle reading of the testimony; in any case, there is testimony from the attorney that suggests he knew that "this particular frequency was going to be suggested" to someone, which suggests he knew that the appellants intended to instigate, not merely assist, an application, J.A. at 270. Our resolution of the issue of appellants' good faith belief in the legality of their conduct does not turn on the distinction found by the Board. *See infra* pp. 1541–1543.

that Bullard showed him the frequency study prepared for Cullman, which is twenty-eight miles from Sumiton, indicating that a number of frequencies, including 1540 kHz., were available; that Bullard also showed Sims his own "thumbnail sketch" of frequencies available in Sumiton; that Bullard said he thought the best frequency for Sumiton would be 1540 kHz.; that that frequency was selected that evening; and that Millar suggested the capital structure for the corporation that was eventually formed to prepare the application. Sims testified without contradiction that Millar offered to advance or give Sims the $500 that that capital structure called for as Sims's contribution.

The principal testimonial conflicts concerning this meeting revolve around whether Millar admitted that his purpose was to block the Cullman Music application. Sims stated in an affidavit, and later testified, that Millar admitted such a purpose, and that Millar further said that appellants' involvement should be kept secret, and that it was necessary to file the Sumiton application before the Cullman Music application could be amended and refiled. Millar and Bullard denied that they admitted an intent to block, that they told Sims to keep their conversations secret, and that they told him the application had to be filed soon. They also said that the frequency selected for Sumiton was not predetermined, but rather that Sims and Bullard mutually decided that 1540 kHz. would be "the best frequency" for that town, J.A. at 201, 249.

Within two days of this meeting, Millar called his Washington consulting engineer, Julius Cohen, to inform him that he, Cohen, would be preparing the engineering portion of a Sumiton radio station application.[3] The engineer dictated a memorandum immediately after the call, as was his practice. The memorandum, dated December 1, 1965, reads as follows:

Re: WKUL
 11/30/65

Millar asked that we proceed with the preparation of the application for 1540 KC in Sumiton, Alabama. Mr. Millar will not be the principal. There are a group of four or five who are filing this application. Millar asks that we proceed. We will get site information such as photos and property sketches, business and industrial areas within the community and so forth. It is desirable to get the application filed before the prior Cullman applicant refiles an application that had been returned. In any event, the Sumiton group has been considering this frequency for many months and will proceed regardless of what action the Cullman applicant may make.

J.A. at 299. This memorandum, which appears to indicate that Millar had a substantial role in the Sumiton application and that he expected the Cullman application to be refiled, was retracted in part by Cohen at the hearing. Cohen, testifying after Millar had denied crucial parts of the memorandum, said that Millar had not ordered him to proceed and that it was Cohen who had suggested that the Sumiton application be filed before the Cullman application could be refiled.

Sims proceeded to gather a group of two other investors to form the corporation and prepare the application. During this period, both Millar and Sims testified that the two had several phone conversations concerning the Sumiton application, and Sims stated that in these calls, which he said Millar initiated, Millar would "push[ ] me to find out what the hold-up was, who was dragging their feet and why we weren't moving any faster," J.A. at 21.

Eventually, Sims withdrew from the project, claiming lack of time, and was replaced by J.L. Sartain. Sartain, not having prepared an application before, expressed a need for assistance on the project. After clearing this course with Millar's Wash-

3. Millar testified that Sims had selected Cohen and that Millar made the call because he had to call Cohen on another matter anyway. Sims testified that Millar had told him that Millar's consulting engineer would take care of the engineering portion of the application.

ington counsel,[4] Bullard was hired in December 1965 to help prepare the application. Bullard testified that he did not mention his or Millar's prior involvement in the project to the three Sumiton group members because "[i]t just never came up" and because two of the group members "did not view Mr. Millar favorably." J.A. at 251. Sims also did not disclose the earlier meeting and conversations, but he testified he did so on instructions from Millar. J.A. at 161–62. The Sumiton group filed its application with the Commission on January 24, 1966. The Cullman Music application was refiled on April 14, 1966.

Because the applications were mutually exclusive, they were designated for a hearing on standard comparative issues. Based upon affidavits filed by the Cullman Music applicants describing, *inter alia,* the meetings with Mitchell and Sims, and Bullard's participation in the preparation of the Sumiton application, a strike issue was added against Sumiton Broadcasting. Appellants Millar and Bullard were made parties to the proceeding, since the affidavits accused them of instigating the filing of the Sumiton application and conspiring with the Sumiton principals to block the Cullman Music application. On May 26, 1969, a further technical issue was designated against the Cullman Music application. The Cullman Music applicants then largely ceased their participation in the proceedings and their application was dismissed on the last day of the hearings. Thus, the Sumiton application alone was considered.

Hearings were held in December 1969 and March 1970 before FCC Hearing Examiner Thomas H. Donahue. On July 24, 1970, after all the testimony had been received, but before the closing of the record, Examiner Donahue retired and, four days later,

the case was assigned to a new hearing examiner. The record was held open for the submission of exhibits and corrections to the transcripts, but no further testimony was taken. No objection was made to the substitution of hearing examiners.

On May 26, 1972, the substitute hearing examiner, the late Charles J. Frederick, issued an initial decision in which he concluded that the Sumiton Broadcasting application had been filed as a strike application through the efforts of Millar and Bullard, although without the knowledge of the Sumiton principals. He found that in any case the Sumiton application had to be denied because of the filing of a forged affidavit by one of its former principals and the failure of the applicants to report changes in stockholder and financial qualifications, as required by the Commission's rules. *Sumiton Broadcasting Co.,* 45 F.C.C.2d 1000 (Initial Decision 1972), *aff'd,* 45 F.C.C.2d 933 (Rev.Bd.1974), *rev'd in part & review denied in part,* 66 F.C.C.2d 656 (1977).

Appellants and the Sumiton applicants sought review of the initial decision before the Commission's Review Board. The Board considered the substitute examiner's detailing of his findings and conclusions to be inadequate, and it therefore undertook a *de novo* review of the record in minute detail. The Board concluded that appellants were guilty of strike conduct, having instigated and assisted in the preparation of the Sumiton application for the purpose of deterring or blocking the Cullman Music application, and that the Sumiton principals were knowing participants in that conduct. The Review Board thus affirmed the examiner's decision while declining to adopt the findings supporting that decision.[5]

---

**4.** The Review Board suggested, based largely on several witnesses' confusion over the date of the phone call in which counsel was asked about the propriety of Bullard working on the Sumiton project, that no such clearance was given. 45 F.C.C.2d at 973–76. There is very little evidence to support such a conclusion, given the uncontradicted testimony on the point. We do not in any case view the finding as crucial to the result below.

**5.** In view of its decision that the Sumiton principals were involved in the strike conduct, the Review Board found it unnecessary to reach the question of the allegedly forged affidavit and other alleged rule violations, but did so nonetheless, concluding it would not have disqualified the Sumiton applicants on that basis alone. 45 F.C.C.2d at 943.

Appellants and the Sumiton applicants filed applications for review with the Commission. Appellants' application was summarily denied. *Sumiton Broadcasting Co.,* 66 F.C.C.2d 656, 657 (1977).[6] This appeal followed.

## II

The Commission's strike policy has been derived over the years from the broad command of the Communications Act that licenses may be issued to such citizens or nationals "as the Commission finds qualified." 47 U.S.C. § 303(*l*)(1) (1976). The essence of the policy is expressed on the application form for broadcast licenses, which requires a representation that "this application is not filed for the purpose of impeding, obstructing, or delaying determination on any other application with which it may be in conflict." FCC Form 301, J.A. at 1. *See generally Pressley v. FCC,* 437 F.2d 716, 720 (D.C.Cir.1970). This policy, intended to protect the Commission's processes from abuse and ensure that licensees adhere to certain ethical standards, has been extended not only to applicants, but to licensees who participate in or instigate the filing of applications for the purpose of blocking a competitor. *See id.* at 721; *Asheboro Broadcasting Co.,* 20 F.C.C.2d 1, 3 (1969) ("Any licensee who is found to have participated in the filing of an application, one of whose purposes is the obstructing, impeding, or delaying of a grant of another application, places in jeopardy the authorization for the existing station which is the intended beneficiary of the strike application."); *John C. Roach,* 20 F.C.C.2d 255, 257–58 (1969) (license renewal denied, in part because of prior "complete sponsorship" of a strike application), *aff'd sub nom. Gordon County Broadcasting Co. v. FCC,*

446 F.2d 1335 (D.C.Cir.1971); *Capitol Broadcasting Co.,* 30 F.C.C. 1 (1961) (license denied where applicant's president had filed a strike application to impede a competitor).

Appellants object that the policy laid out above was insufficiently defined in 1965, when the alleged strike activity in this case took place, and therefore should not be retroactively applied to them. They cite a string of decisions that they say stand for the proposition that "the applicant's good faith intent to build [the station applied for] will absolve a licensee on charges of strike activity." Reply Brief for Appellants at 22; *see id.* at 20 (citing *Smackover Radio, Inc.,* 36 F.C.C. 776 (1964), *Northern Indiana Broadcasters, Inc.,* 45 F.C.C. 1504 (1964), and *Radio Station WTIF, Inc.,* 1 F.C.C.2d 1543 (Initial Decision 1965)).

■ We think appellants' own conduct and admissions in this case belie their claim that they relied on the Sumiton group's good faith intent to build to absolve them. They admit that they knew they were barred from assisting a Sumiton applicant while the Cullman Music application was on file, regardless, apparently, of the *bona fides* of the applicant's intention to build the station. *Sumiton Broadcasting,* 45 F.C. C.2d at 953 (Bullard testified that when a conflicting application is on file, he would not touch it "with a 10 ft. pole"); *see* J.A. at 193–96, 201 (Millar's understanding was the same). Consistent with that belief, they did not approach Sims until immediately after the Cullman Music application was returned.

Appellants must argue, therefore, that the crucial factor for them was not the applicant's intent to build, which the Commission agrees was once a determinative factor,[7] but rather whether a competing

6. In the same decision, the Commission granted Sumiton's application for review and modified the findings of the Review Board. The Commission determined that there was insufficient evidence to support the Board's conclusion that the Sumiton principals were aware of any strike conduct and granted the Sumiton application for a construction permit. Those portions of the Review Board and Commission decisions dealing with the grant or denial of the

Sumiton application are not before us on this appeal.

7. The Commission argues that its policy had clearly changed by 1965, so that the crucial question was the striker's intent to block another application. It cites in support cases such as Capitol Broadcasting Co., 30 F.C.C. 1, 2, 3 (1961) ("[I]ntent to construct and operate does not render irrelevant the existence of im-

application was in fact on file and pending with the Commission. This appears to have been the claim they sought to advance in their testimony. *See* J.A. at 193–96, 201; 45 F.C.C.2d at 953. They cite no case law, however, in support of making the difference between pending and returned applications the crucial distinction.

The Review Board concluded that such a rule would, *inter alia,* "defeat[ ] the Commission's strike policy." *Id.* at 940. The Board also canvassed the Commission's rules and found that returned applications are not treated like withdrawn or dismissed applications. *Id.* at 938–39 & n. 13 (citing 47 C.F.R. § 1.1102(i) (1972) (derived from 47 C.F.R. § 1.1103(d) (1964)) (returned applications may be refiled without payment of additional fee unless changes are major)). Citing appellants' own experience with an application that was filed, returned as untimely, and then refiled in 1965, 45 F.C.C.2d at 950, the Board found that appellants' claimed assumption that the Cullman Music application would not be refiled on the same frequency was a "delusive liberty," *id.* at 988.

We agree that the appellants' claimed reliance on the line between pending and returned applications was, if it occurred,

proper motives ["in the filing of the application, such as a desire to impede, obstruct, or delay the grant of a competing application"]."); Blue Ridge Mountain Broadcasting Co., 37 F.C.C. 791, 800 (Rev.Bd.1964) (test was formerly intent to build, "[h]owever, the Commission has more recently held that irrespective of a finding of intent to construct, an application can be denied where there exists an improper motive in the filing of the application, such as a desire to impede, obstruct, or delay grant of another application"), *review denied,* FCC 65–5 (Jan. 6, 1965), *aff'd sub nom. Gordon County Broadcasting Co. v. FCC,* 6 Rad.Reg.2d (P & F) 2044 (D.C.Cir.1965) (mem.); and Al-Or Broadcasting Co., 37 F.C.C. 935, 948 (Initial Decision) ("So alien are [strike applications] to the proper purposes of the hearing process that the Commission in recent years has condemned them even when the applicant demonstrated that he intended to construct and operate the station in event of a grant."), *aff'd,* 37 F.C.C. 917 (Rev.Bd.1964), *review denied,* FCC 65–99 (Feb. 11, 1965), *aff'd sub nom. Corbett v. FCC,* 6 Rad.Reg.2d (P & F) 2023 (D.C.Cir.1965) (mem.).

self-delusion that was and continues to be unsupported by law or logic. As the Commission pointed out in its brief to this court, "It makes no rational difference under the strike policy whether an application is filed following the filing of another in order to impede the latter, or ... [it is filed] in anticipation of the filing of another in order to discourage any such filing and to ensure at a minimum that the other application [will] not quickly be granted." Brief for Appellee at 37. We think it clear that the crucial element was and is an intent to block another application. *See, e.g., Blue Ridge Mountain Broadcasting Co.,* 37 F.C. C.2d 791, 796, 800–01 (Rev.Bd.1964) (an application will be denied if filed solely or in part to impede, obstruct, or delay grant of another application), *review denied,* FCC 65–5 (Jan. 7, 1965), *aff'd sub nom. Gordon County Broadcasting Co. v. FCC,* 6 Rad. Reg. 2 (P & F) 2044 (D.C.Cir.1965) (mem.); *Al-Or Broadcasting Co.,* 37 F.C.C. 935, 948 (Initial Decision) ("Motivation is therefore of importance and where the motive is to create a hearing situation in order to hinder a potential competitor, it is condemned."), *aff'd,* 37 F.C.C. 917 (Rev.Bd.1964), *review denied,* FCC 65–99 (Feb. 11, 1965), *aff'd sub nom. Corbett v. FCC,* 6 Rad.Reg.2d (P & F) 2023 (D.C.Cir.1965) (mem.).[8]

8. In 1971, the Commission issued "guidelines" to be used in determining whether an application was filed with the principal or incidental motive of obstructing or delaying another application. These guidelines are as follows: "(1) the timing of the application, (2) the economic and competitive benefit occurring from the application, (3) the good faith of the applicant, and (4) questions concerning a frequency study." Grenco, Inc., 28 F.C.C.2d 166, 167 (1971). The Review Board in the case at bar applied these guidelines in evaluating the evidence of a "strike" motive. *Sumiton Broadcasting,* 45 F.C.C.2d at 989–91.

Appellants argue that retroactive application of the *Grenco* guidelines was "fundamentally unfair." Brief for Appellants at 33. We agree with the government that *Grenco* did not announce new standards of conduct, but merely advanced guidelines for weighing the evidence in order to make a finding of whether the requisite intent existed. The guidelines serve to highlight critical facts that, in the Commission's view, are most likely to reveal the intent of the alleged striker. While it may be argued that the fourth *Grenco* criterion places on

## III

The Review Board gave two reasons for refusing to remand the case for rehearing before the substitute examiner. First, the Board apparently felt that any objection to a decision by a substitute examiner should have been made at the time of substitution. The Board stated that

[a]t that time, [appellants] had a choice of seeking a new trial if they then believed, as they now assert, that demeanor findings which can be made only by the trier-of-fact who observed the witnesses, are an indispensable element of a fair and just decision. They did not do so.

45 F.C.C.2d at 933 n. 3. Second, the Board held that demeanor findings were not a legal prerequisite to a valid decision nor needed to assure a fair and just result. The Board held that

assuming *arguendo* that Judge Donahue in the instant case had issued the Initial Decision and had made favorable demeanor findings with respect to Millar and Bullard, . . . such favorable demeanor findings could not withstand the clear and convincing facts which are detailed in our Decision here.

*Id.* at 936 n. 8. We affirm on both grounds.

### A. Lack of a Timely Objection

The appellants in this case did not move to have the substitute examiner rehear any of the testimony nor object to his failure to do so until their briefs and oral argument before the Review Board, more than twenty-two months after they were notified of the substitution. As the Supreme Court has written in the context of objections to the manner of a hearing examiner's appointment, "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred

against objection made *at the time appropriate under its practice."* United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (emphasis added). This rule is given particular force in the case of the FCC by section 405 of the Communications Act, which suggests that it may be a "condition precedent to judicial review" that the authority making the particular order complained of have had "opportunity to pass" on the question raised. 47 U.S.C. § 405 (1976).

Section 405 appears to establish that the appropriate time for objection to a failure to rehear was while the matter was at the hearing examiner stage. In any case, we may assume, absent evidence to the contrary, that the Review Board accurately stated Commission practice when it suggested that the proper time for objection to the failure to hear new testimony was at the time of substitution. *See* 45 F.C.C.2d at 933 n. 3. Clearly, appellants did not comply with this practice.

Other courts have held that the lack of a timely motion to have a substitute hearing examiner rehear testimony will be construed as a waiver of the objection. *See, e.g., Pigrenet v. Boland Marine & Manufacturing Co.,* 656 F.2d 1091, 1095 (5th Cir. 1981) (en banc) ("We have previously held that a party, in order to preserve the issue for appeal, must object at the fact-finding level to a substituted fact-finder's failure to conduct a new evidentiary hearing."); *Braswell Motor Freight Lines, Inc. v. United States,* 271 F.Supp. 906, 908–11 (W.D. Tex.1967) (three-judge district court) (objection to change of examiners midway through hearings was untimely where not made until ten months after substitution, once examiner had filed his report); *see also Anaya v. Romero,* 627 F.2d 226, 228 (10th Cir.1980) (per curiam) (failure to object to change in magistrates until appeal constituted waiver; "the issue was an obvi-

license applicants the duty of making a good faith search for alternative frequencies before filing on one that will block another application, even this had been emphasized as relevant prior to 1965, AL–OR Broadcasting Co., 37 F.C.C. 917, 922 n. 7 (Rev.Bd.1964) ("The Board

is of the view that failure to conduct a frequency study is, under certain circumstances, a valid consideration in determining an applicant's intentions."), *review denied,* FCC 65–99 (Feb. 11, 1965), *aff'd sub nom. Corbett v. FCC,* 6 Rad.Reg.2d 2023 (D.C.Cir.1965) (mem.).

ous one for appellant to raise if he thought it worthwhile") (footnote omitted), *cert. denied,* 450 U.S. 926, 101 S.Ct. 1380, 67 L.Ed.2d 356 (1981). As this court has said in a related context, "It will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor. A contrary rule would only countenance and encourage unacceptable inefficiency in the administrative process." *Marcus v. Director, Office of Workers' Compensation Programs, U.S. Department of Labor,* 548 F.2d 1044, 1051 (D.C.Cir.1976) (objection to bias of administrative law judge was untimely when first made to Review Board).[9]

 Thus, we think appellants' failure to raise before the substitute examiner the question of rehearing testimony constituted a waiver. Nevertheless, we do not think the Review Board's opinion is crystal clear that the Board in fact relied on this point in its refusal to order rehearing. *See Sumiton Broadcasting,* 45 F.C.C.2d at 933 n. 3 (quoted *supra* p. 1537). Therefore, we go on to consider the validity of the Board's clear holding that demeanor findings could not affect their result. *See generally SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (agency action must be judged solely on the grounds invoked by the agency).

### B. *Need for Demeanor Findings*

The starting point in deciding whether it was permissible for the Review Board in this case to decide the matter without the benefit of demeanor findings is the Administrative Procedure Act, which provides that "[t]he employee who presides at the reception of evidence ... shall make the recommended decision or initial decision ..., unless he becomes unavailable to the agency." 5 U.S.C. § 554(d) (1976). Arguably contrary to the implication of these words, this section has been widely interpreted to allow the agency, once the examiner who presided at the hearings becomes unavailable, to dispense with a rehearing of testimony before the new examiner only when demeanor evidence is unnecessary or of little consequence in deciding the case. *See, e.g., Appalachian Power Co. v. FPC,* 328 F.2d 237, 240 (4th Cir.) (rehearing needed where demeanor is "an important factor"), *cert. denied,* 379 U.S. 829, 85 S.Ct. 59, 13 L.Ed.2d 38 (1964); *Gamble-Skogmo, Inc. v. FTC,* 211 F.2d 106, 115 (8th Cir.1954) (rehearing not required when credibility evaluation based on hearing and seeing witnesses testify is "unnecessary" or not "of material assistance"); *Van Teslaar v. Bender,* 365 F.Supp. 1007, 1012 (D.Md.1973) (rehearing needed where "demeanor and conduct of the witnesses might be important"); *Brooklyn Eastern District Terminal v. United States,* 302 F.Supp. 1095, 1105 (E.D.N.Y.1969) (three-judge district court) (rehearing unnecessary where demeanor "is of little or no consequence"); 2 K. Davis, *Administrative Law Treatise* § 11.18, at 113 (1958) (key consideration is to prevent demeanor, "whenever it may be a substantial element," from getting lost).

Courts and commentators have identified several kinds of cases in which demeanor evidence is not necessary or is of little consequence. For example, credibility of witnesses may be of utterly no significance, as when a case turns on a question of public records or stipulated facts. *See id.* (stipu-

---

**9.** Without deciding whether the plain or fundamental error doctrine applies to a failure to make timely objection in the FCC, we note that in this case, in which there is considerable evidence of appellants' misconduct, the failure to consider demeanor evidence, even if it were erroneous, could not be considered "error so serious and flagrant that it goes to the very integrity of the trial," *Modave v. Long Island Jewish Medical Center,* 501 F.2d 1065, 1072 (2d Cir.1974).

We also note that the substitute examiner's statement that he always found it "trying upon the conscience ... to take a 'cold' record and, not having the privilege of confronting principals and witnesses, come to a fair conclusion that he can 'live with,'" *Sumiton Broadcasting,* 45 F.C.C.2d at 1019 (Initial Decision), does not necessarily suggest that he had considered the question and decided to take no action, so that any objection would have been fruitless. The statement might be more plausibly read to suggest a willingness to grant a motion for a new hearing were he directly forced to refuse or agree to do so.

lated facts); W. Gellhorn & C. Byse, *Administrative Law* 1056 (4th ed. 1960) (record questions). In other cases, credibility may play a role, but demeanor may not, as when the crucial evidence is presented through documents, such as affidavits, depositions, or extrajudicial writings, *see* 2 K. Davis, *supra*, § 11.18, at 113 (documentary evidence); Note, *Replacing Finders of Fact—Judge, Juror, Administrative Hearing Officer,* 68 Colum.L.Rev. 1317, 1328 (1968) (affidavits, depositions), or when the conflicting testimony is that of experts, *see New England Coalition on Nuclear Pollution v. United States NRC,* 582 F.2d 87, 100 (1st Cir. 1978) (credibility of experts is "a function of logical analysis, credentials, data base, and other factors readily discernible to one who reads the record," not of demeanor); Note, *supra*, at 1328 & n. 52 (reliance on expert's demeanor to determine credibility is "dangerous").

Finally, even in cases turning on resolution of conflicting, nonexpert testimony, courts have said that a witness's testimony may be, under the circumstances of the case, so incredible, or contrary evidence may be so overwhelming, that demeanor could not convince a reasonable factfinder that the witness was telling the truth. *See Gamble-Skogmo,* 211 F.2d at 115 (if testi-

mony is "inherently incredible," demeanor is irrelevant); *St. Louis Southwestern Railway v. Henwood,* 157 F.2d 337, 342 (8th Cir.1946) (conflicts between testimony and documents "speak from their face" and demeanor is of little use), *cert. denied,* 330 U.S. 836, 67 S.Ct. 965, 91 L.Ed. 1282 (1947); Note, *supra,* at 1329 (decision can be made on written record alone where testimony of one party is "so intrinsically incredible, so unlikely in view of documentary evidence or undisputed testimony in the case, or so tenuous compared to contrary evidence that no matter how convincing the demeanor of the witness who presents it, he will be disbelieved") (footnotes omitted); *id.* at 1343–44.[10] In these cases, too, there should be no hesitation in allowing decision on the written record alone.[11]

▮ The Review Board here concluded that the case at bar fell into this last category. It held that "assuming *arguendo* that Judge Donahue in the instant case had issued the Initial Decision and had made favorable demeanor findings with respect to Millar and Bullard, ... such favorable findings could not withstand the clear and convincing facts which are detailed in our Decision here." *Sumiton Broadcasting,* 45 F.C.C.2d at 936 n. 8. Its method was thus

---

10. A similar rule has developed in cases involving conflicting testimony where an initial judgment or verdict is issued by one who observed the testimony but did not make explicit demeanor findings, and that judgment is reviewed by others. *See, e.g., NLRB v. Marcus Trucking Co.,* 286 F.2d 583, 589 (2d Cir.1961) (hearing examiner's finding may be rejected on appeal if they are based on testimony that is " 'on its face ... hopelessly incredible' " or if " 'the corroboration of [the] lost [demeanor] evidence could not [be] enough to satisfy any doubts raised by the words' ") (quoting *NLRB v. Dinion Coil Co.,* 201 F.2d 484, 490 (2d Cir.1952), and *NLRB v. James Thompson & Co.,* 208 F.2d 743, 746 (2d Cir.1953)); *Norfolk S. Ry. v. Davis Frozen Foods,* 195 F.2d 662, 665 (4th Cir.1952) (court reversed trial judge and ordered directed verdict for plaintiff where defendant's testimony contradicted by common sense and other testimony); *cf. Carbo v. United States,* 314 F.2d 718, 749–50 (9th Cir.1963) (in criminal case where original judge died after jury verdict, successor could rule on defendants' motions for new trial and for judgment n.o.v. and could impose sentence where, although govern-

ment's testimony was flatly contradicted, corroboration of other evidence placed government's case "safely beyond demeanor impeachment"), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964).

11. We note that there is language in *Gamble-Skogmo, Inc. v. FTC,* 211 F.2d 106 (8th Cir. 1954), which we acknowledge is the leading case on this issue, that suggests a prophylactic rule requiring a rehearing whenever there is conflicting oral testimony in a case. *See, e.g., id.* at 113 (the opportunity to make a direct credibility examination has "generally been regarded, in the processive aspect of attaining justice, as inherently tending to more probable fairness and readier acceptance of judicial or quasi-judicial decision"). We think such a rule, which in any case was undermined by the exception in *Gamble-Skogmo* for cases in which one side's testimony is "inherently incredible," *id.* at 115, would be illogical—because it would require a purely *pro forma* rehearing—and contrary to the weighty and persuasive authority detailed above.

precisely that envisioned by the authorities cited above: it hypothesized a set of demeanor findings consistently contrary to the result it reached and asked whether those findings would change its result. We can review this result just as we review any other case: we ask, does the evidence, including the hypothetical demeanor findings, support the result? In the case of an agency, the amount of evidence required to support the result is "substantial evidence." *See* 5 U.S.C. § 706(2)(E) (1976). *See generally* 4 K. Davis, *supra,* §§ 29.01, 29.02.[12]

This is a deferential standard of review, narrower than our review of a judge's findings under the clearly erroneous standard. *Id.* § 29.02, at 121–24. As Professor Davis has written, "the main inquiry is whether on the record [including, in this case, the hypothetical demeanor evidence] the agency could reasonably make the finding." *Id.* § 29.01, at 118; *see also Consolidated Edi-*

*son Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938) ("Substantial evidence .... means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). The question we must answer thus is essentially whether the agency's conclusion that demeanor could not affect its result is reasonable on the record as a whole, including the hypothetical demeanor findings. It should be recalled that our review might well permit the agency to reach either of two contradictory results. *See, e.g., American Federation of Television & Radio Artists v. NLRB,* 395 F.2d 622, 628 (D.C.Cir.1968).

■ Our review of the facts under this standard constrains us to uphold the Commission in this case. While certain of the Board's collateral findings might be subject to attack, its ultimate conclusion that Millar and Bullard instigated and assisted the Su-

---

12. Another approach to review of this issue is possible. Rather than review the agency's ultimate finding of an intent to impede the Cullman Music application, applying the substantial evidence standard to a record that includes hypothetical demeanor findings, we could separately review, under an abuse of discretion standard, the decision not to rehear testimony. The latter approach is that taken by the First Circuit in *New England Coalition on Nuclear Pollution v. United States NRC,* 582 F.2d 87 (1st Cir.1978). The court there regarded the decision whether demeanor was necessary "to be a question of procedure and evidence committed to the discretion of the agency." *Id.* at 100. It held there was no abuse of discretion in not holding new hearings when one examiner resigned, because (1) evaluation of the credibility of experts does not depend on demeanor, and (2) the Commission had an "obvious and significant" interest in not repeating the long process of evaluating an application to build a nuclear power plant. *Id.*

What is noteworthy for present purposes about the First Circuit's approach is that the court, in upholding the agency, was evidently motivated by consideration of the burden on the agency of rehearing the matter. Thus, it called the decision one "of evidence and procedure," like rules designed to foster efficient disposition, and considered the agency's need to avoid repeating lengthy proceedings. Our review is somewhat different because we limit it to the record at hand and to whatever substantive competence the agency brings to that record, excluding considerations of docket control and efficiency. *See* 4 K. Davis, *supra,* § 29.02, at 119 (substantial evidence review

defers to the agency's opportunity to evaluate credibility and to the agency's substantive expertise).

We are uncertain whether extra-record considerations such as the state of an agency's docket, the difficulty of rehearing, or the relative importance of the matter should affect whether the agency can decide to exclude demeanor evidence. The hard case is where the addition of uniformly contrary demeanor findings would so undermine the credibility of certain witnesses that the result reached by the agency would no longer be supported by substantial evidence. Should a court even then allow the agency not to rehear testimony if, for example, the rehearing would take months as opposed to a single day? On the other hand, there may be cases in which an extra-record consideration such as the appearance of justice would require a new hearing even though demeanor would not affect the result.

As to the latter half of this problem, appellants have not suggested that there is any special reason why this particular case should be reheard if demeanor would not affect the result. *See also supra* note 11. As to the more difficult first part—whether the agency's need to control its docket and like factors might allow it to forgo a new hearing even though demeanor might influence the result—we do not think the issue is raised by this case, because the agency's findings here can be upheld under the substantial evidence standards with reference only to the record and the agency's substantive expertise.

miton application with intent to block, delay, or impede the Cullman Music application is amply supported.

The uncontroverted evidence shows that appellants were deeply concerned about the competitive threat a new station would pose: as soon as he heard about the Cullman Music application, Millar visited Mitchell and mentioned the cost and delay an economic injury protest would incur; he paid calls on several supporters of the application and urged them to withdraw their support; he and Bullard searched for stations elsewhere that would shore up their threatened business.

Moreover, the record is clear that Millar and Bullard went to extraordinary lengths to instigate the Sumiton application: they approached Sims with a virtually complete plan for the station, including a capital structure for the proposed corporate owner; Bullard suggested the only frequency that would block the Cullman application and the parties immediately settled on that frequency; Millar may have offered to supply part of the initial capital required; Millar called his own engineer and told him to start on the application; Millar was kept, or kept himself, informed about the progress of the application.

The crucial nexus between these two inferences—motive and action—is supplied by the timing (three days after the return of the Cullman application), the lack of a plausible alternative motive (the appellants said they were merely doing Sims a favor), and, in small part, by the fact that their participation was kept a secret. Moreover, the witnesses who testified to more direct admissions of intent—Cohen in his memorandum, and, to some extent, Sims—do not appear to have had the motive for lying that appellants clearly had.[13] We find that no matter how persuasive demeanor findings in favor of Millar and Bullard might be, the Board's finding on the intent to block would be fully supported by substantial evidence.

The Board also made findings on whether this intent might be mitigated by a good faith belief in the legality of their conduct. The Board found that appellants did not follow their attorney's advice, which it found was limited to assistance to, not instigation of, a 1540 kHz. application, and that in any case, the appellants knew that their conduct was prohibited. *Sumiton Broadcasting*, 45 F.C.C.2d at 966, 988. It is the latter of those two alternative holdings that we affirm.[14]

**13.** In fairly extensive cross-examination, appellants attempted to establish that Sims was biased against them because he was seeking a loan from the owners of a station in Jasper, Alabama, and was otherwise associated with the owner of the other station in Jasper, both of which would suffer competition from a new station in Sumiton ten miles away. *See* J.A. at 138–60; Brief for Appellants at 61. It appears, however, that Sims's testimony could not have damaged the Sumiton application but was useful only to show Millar and Bullard's intent. It therefore could not have prevented the new Sumiton station from coming on line. Certainly if Sims was intent on blocking the Sumiton application he, and perhaps he alone, could have established the link between appellants' motive to block and the applicants. The Review Board apparently did not regard Sims's credibility as seriously undermined by these associations, *Sumiton Broadcasting*, 45 F.C.C.2d at 989, and neither do we.

Cohen's memorandum is somewhat ambiguous, but overall it reveals Millar's interest in and substantial control of the Sumiton application in its early stages. It also evinces a clear

concern with the Cullman Music application, and an expectation that it would be refiled. Although Millar and the engineer disavowed the crucial portions of the memorandum, "[w]here ... testimony is in conflict with contemporaneous documents we can give it little weight," *United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *accord St. Louis S. Ry. v. Henwood*, 157 F.2d 337, 342 (8th Cir.1946) (differences between oral testimony and prior written statements "speak from their face and little aid in judging credibility is gained by viewing the witness"), *cert. denied*, 330 U.S. 836, 67 S.Ct. 965, 91 L.Ed. 1282 (1947).

**14.** With regard to this holding, the Board stated that appellants

knew, on the basis of their own knowledge and experience—and as a matter of fact—that their "bent" on a 1540 kHz Sumiton application was a path that knowledgeable broadcasters, like [appellants], would not tread because of their own good faith and judgment, irrespective of the advice of counsel. In short, they knew that their plans

The primary evidence on this point is that the participation of Millar and Bullard was kept secret from the members of the Sumiton group, even during Bullard's later assistance in the preparation of the application, during which he worked closely with Sartain for eight ten-hour days. The Commission found that this earlier participation was not revealed, 66 F.C.C.2d at 659, 664, and neither party here disputes that finding.[15] This fact alone argues strongly in favor of a finding of bad faith.

The only dispute is over whether the reason for this secrecy was that "[i]t just never came up" or that Bullard kept it from the group because some of its members "did not view Mr. Millar favorably," as Bullard testified, J.A. at 251, or that it was necessary to keep the involvement secret because it would reveal the illegal intent to block, as Sims testified, J.A. at 161–62. Appellants have cited no testimony from the Sumiton group members corroborating Bullard's statement that they disliked Millar, or why. There is also no suggestion that Sims was aware of this dislike when he did not divulge appellants' involvement to his future partners. Moreover, since there is substantial evidence that appellants, or at least Millar, expected the Cullman Music application to be refiled,[16] their claim of good faith belief in legality is based on what we have found to be the utterly illogical conclusion that as long as there was no competing application actually on file, preparation of an application that would block Cullman Music's would be legal, regardless of intent. In addition, appellants cannot deny that they knew their projected course was of at least questionable legality, because their attorney made clear that he advised them that a strike allegation might be made against them for it. J.A. at 290. Finally, they have not succeeded in casting any seri-

---

were—as a matter of fact—a path of deliberate misconduct. 45 F.C.C.2d at 966.

It is not clear that even if the Board had found that appellants had acted consistently with the advice of counsel it would have exonerated Millar and Bullard. The Board specifically distinguished a case, Asheboro Broadcasting Co., 20 F.C.C.2d 1 (1969), in which good faith reliance on legal advice, as well as other factors, had been allowed to mitigate what would otherwise have been strike conduct. 45 F.C.C.2d at 965 n. 37, 991–92. In Asheboro, the Board pointed out, the lawyer had given detailed testimony explaining why he thought Commission precedent to be what he told his clients, while in the case at bar the lawyer's testimony "relate[d] solely to his conclusionary advice without detailing his reasons." Id. at 992. The Board evidently thought the reasonableness of the lawyer's advice was crucial to a claim of expert-advice mitigation, and that proof of that element was lacking here. It appears, therefore, that the finding that appellants were themselves aware that their conduct was prohibited is the crucial one on this issue, and our attention is thus directed there. See also Asheboro, 20 F.C.C.2d at 3 ("advice of counsel cannot excuse a clear breach of duty by a licensee").

15. The FCC's Broadcast Bureau, which prosecuted the strike allegation after the Cullman Music application was no longer being actively pursued, advocated throughout the hearings that the Sumiton group was innocent of strike conduct, evidently because the group did not know appellants had instigated the application or their purposes in doing so. See 66 F.C.C.2d at 657 n. 10 (Commission opinion).

16. The Board found that Millar expected the Cullman Music application to be refiled, see 45 F.C.C.2d at 989 (semble), or that he "took the delusive liberty of assuming it would not be," which amounts to the same thing, id. at 988. The primary support for this conclusion is Cohen's memorandum of his conversation with Millar, which states in part, "It is desirable to get the application filed before the prior Cullman applicant refiles an application that ha[s] been returned." J.A. at 299. If Millar stated this, as seems most likely given the nature of the memorandum, it is clear that he expected the refiling would be on the same frequency, since otherwise there could be no advantage to filing first, as apparently there would be with the applications on the same frequency. While Cohen said in his testimony that it was he who suggested this, not Millar, he conceded the subject was possibly discussed. This rewriting does not significantly alter the evidence that Millar himself expected the application to be refiled, since it seems clear that the memorandum is intended to describe the client's ideas or those suggestions of the engineer to which the client has agreed.

The only significant evidence cited to the contrary is Millar's testimony that he expected the Cullman Music application to be refiled, if at all, on another frequency. J.A. at 198. We think it was within the Board's discretion to reject this testimony without demeanor findings. See supra note 13.

ous doubt on the general credibility of Sims, while Bullard's self-interest is obvious.

The totality of these circumstances tips the scale substantially in favor of Sims's version of events. We think that, given the discretion inherent in the substantial evidence standard, even the addition of contrary demeanor findings would not so shift the balance that we would reverse a Board finding of bad faith.[17]

---

17. We need say little more to answer two of the other objections raised by appellants to the Commission's decision: that certain of the Review Board's findings are unsupported by substantial evidence, and that even the facts as found by the Board do not amount to strike conduct under the standards set out by the Commission in Grenco, Inc., 28 F.C.C.2d 166 (1971). As to the first, we have noted that while the Board may at some points have been overzealous in straining to explain the reasonableness of its ultimate conclusion, see, e.g., supra note 2, we think that as to crucial findings the evidence is reasonably clear, so that the record as a whole substantially supports the Board's conclusion. As to the second, we reiterate that the Grenco criteria are merely evidentiary guidelines to aid in finding an intent to block another application, which intent we have found to be clear in this case. We note that in Grenco itself, immediately after setting out the guidelines, the Commission cited the earlier Review Board opinion that added a strike issue to this case. 28 F.C.C.2d at 167 (citing Sumiton Broadcasting Co., 15 F.C.C.2d 400 (Rev.Bd.1968)). The facts as they then appeared are set out in that earlier opinion, and they are essentially the same as those ultimately found by the Board in the opinion affirmed here. Thus, the FCC specifically contemplated that the Grenco criteria would apply to facts like those in the present case. In any case, we generally agree with the Review Board's application of the guidelines to the evidence in this case. See Sumiton Broadcasting, 45 F.C.C.2d at 989–91.

We dispose of the remaining issues raised by appellants as follows:

(1) Appellants argue that it is contrary to the interest in having stations run by the best qualified licensees, the standard that must guide the Commission, see 47 U.S.C. §§ 151, 303(*l*)(1) (1976), to hold licensees like themselves liable for strike conduct when they have succeeded in bringing qualified licensees to the Commission's attention. Appellants cite Faulkner Radio, Inc. v. FCC, 557 F.2d 866, 875 (D.C.Cir. 1977), to support their assertion that such an application of the policy would have a chilling effect on those who might assist potential applicants, and thus would reduce the flow of qualified applicants to the Commission. We decline to reach this issue because it appears that it was not clearly raised before the Commission. The objection goes to the very heart of an important Commission policy, and we are reluctant to consider it without having the Commission's considered response. See Han-

sen v. FCC, 413 F.2d 374, 376 (D.C.Cir.1969); 47 U.S.C. § 405 (1976) (it is a condition precedent to judicial review that the Commission be given opportunity to pass on questions of fact or law). We note only that we were concerned in Faulkner with cases in which the motive to block or impede a competitor was the subsidiary motive in the filing of a petition, which is certainly not the case here, see 45 F.C.C.2d at 941 (appellants' intent to block termed "beyond doubt"); id. at 967 n. 42 (rejecting as "a lame excuse which is sheer nonsense, on its face," the appellants' claim that they were moved at one point by desire to do the Sumiton applicants a favor).

(2) We find no abuse of discretion in the Commission's limitation of discovery so as to exclude questions concerning the bias of certain witnesses. See Sumiton Broadcasting Co., 18 F.C.C.2d 78, 81 (Rev.Bd.1969) (examiner could reasonably find that discovery requests were "primarily intended" to develop irrelevant issue of motive for refiling Cullman Music application), review denied, FCC 69–1017 (Sept. 25, 1969); 45 F.C.C.2d at 944 n. 21 (hearing examiner allowed latitude in cross-examining the witnesses); J.A. at 138–60 (cross-examination of Sims).

(3) We also find no abuse of discretion in the Commission's granting the Sumiton applicants' petition for review, while refusing appellants'. See 47 U.S.C. § 155(d)(5) (1976) (Commission may grant applications for review, in whole or in part, or deny such applications without specifying any reasons therefore). The Commission's conclusion that the license applicants did not knowingly participate in the strike conduct does not so undermine the Review Board's crucial findings as to appellants that they are no longer supported by substantial evidence.

(4) Finally, appellants have pointed to no specific prejudice in the Review Board's assigning to them the burden of "com[ing] forward with good faith explanations" of their conduct, 45 F.C.C.2d at 898. When the Board originally expanded the hearing to include the strike issue, it assigned the burden of proceeding on the issue to Cullman Music (later replaced by the Broadcast Bureau) and the burden of proof to Sumiton Broadcasting Co. Sumiton Broadcasting Co., 15 F.C.C.2d 400, 409 (Rev.Bd.1968). It was thus clear that the "defendants" would have the burden of showing they had not engaged in strike conduct. Appellants quickly perceived, apparently, that the interests of Sumiton Broadcasting were not coincident with theirs, and they naturally took up their defense on their own behalf. In the absence of a show-

## IV

█ While we agree with appellants that the delays in this case have approached unconscionability, we do not think they are so outrageous, or so clearly the Commission's fault, that action by this court in this particular case is warranted.[18] We do note, however, that the delays have tended to moot the appellants' request for a new hearing in order to take account of demeanor evidence, which they say is necessary to resolve crucial credibility conflicts. Demeanor can only make a difference when a witness testifies from actual memory. Were we to order a remand in this case, it is hard to imagine that a new hearing would provide much live testimony from actual memory. Instead, the hearing would probably consist of reaffirmations of prior testimony, and vague and unreliable claims of actual recollection. Thus, as a practical matter, the delays in this case have tended to leave us with the somewhat uncomfortable choice of dismissing the complaint on the grounds of a denial of some uncertain right to speedy procedures, or making do with what we have. In the circumstances of this case, in which the evidence of strike conduct is compelling, we have perceived the latter to be the course of substantial justice.

For the foregoing reasons, the order appealed from is affirmed.

*It is so ordered.*

ing of specific prejudice, we think it would be an empty adherence to form now to require the Board to have put in writing a method of proceeding that all understood.

As to appellants' objections to the delays in this proceeding, see *infra* note 18.

18. It has been 9 years since the Review Board decision in this case, 11 years since the initial decision, more than 13 years since the first hearings, and 17½ years since the underlying conduct took place. As a result appellants' right to continued operation of their radio stations, and ability to transfer those stations, have been in doubt for what we hope is far longer than the norm. Nevertheless, we also note that, in view of our result here, that delay

has forestalled the presumably worse consequences of a strike finding for many years, allowing appellants to continue to operate their stations for that time. In the exercise of our equitable discretion, *see generally Mobil Oil Corp. v. FPC,* 417 U.S. 283, 311, 94 S.Ct. 2328, 2347, 41 L.Ed.2d 72 (1974); *Nader v. FCC,* 520 F.2d 182, 211 (D.C.Cir.1975) (Fahy, J., dissenting), we make no order with respect to this delay. We do, however, suggest that the Commission, in deciding on the sanctions to be imposed on appellants, consider whether those sanctions should not be eased in some way because of the extraordinarily long period of doubt to which appellants have already been subjected.