**TENANTS COUNCIL OF TIBER
ISLAND–CARROLLSBURG
SQUARE, Petitioner,**

v.

**DISTRICT OF COLUMBIA RENTAL
ACCOMMODATIONS COMMISSION,
Respondent.**

**Tiber Island Corporation and Carrolls-
burg Square Associates, Intervenors.**

No. 13492.

District of Columbia Court of Appeals.

Argued Nov. 9, 1979.

Decided Jan. 8, 1981.

sustaining increases where (1) the landlords were permitted to include the value of land owned by the city in computing the amount of return for the purposes of their hardship petition, *see* § 45–1649, (Section 209 of the Rental Accommodations Act); (2) the landlords were allowed to take excessive rates of depreciation in violation of the Act's rent ceiling provision, *see* § 45–1644(a)(3)(B)(4)(iv), (Section 204(a)(3)(B)(4)(iv)); (3) the landlords were permitted to petition for adjustment without first posting registration statements in violation of statutory requirements, *see* § 45–1642(d), –1644(e) (Section 202(d)—Section 204(e)); and (4) the tenants were not afforded adequate opportunity for cross-examination at the hearing. Finding that in all respects the Commission's findings rest on a sound and reasonable legal and factual basis, we affirm.

Walter H. Fleischer, Washington, D. C., for petitioner.

Frederick F. Stiehl, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel and John C. Salyer, Asst. Corp. Counsel, Washington, D. C., were on brief, for respondent.

Eric Von Salzen, Washington, D. C., with whom Bonnie S. Temple, Washington, D. C., was on brief, for intervenors.

Before NEWMAN, Chief Judge and NEBEKER and MACK, Associate Judges.

MACK, Associate Judge:

In this petition for review of an order of a District of Columbia Rental Accommodations Commission, the Tenants Council of Tiber Island-Carrollsburg Square apartment complexes challenges the agency's affirmance of the granting of intervenor-landlords' petitions for rental increases made pursuant to the then-effective Rental Accommodations Act of 1975. *See* D.C. Code 1978 Supp., §§ 45–1631 to 1674 (repealed March 16, 1978, D.C.Law No. 2–54 § 903, 24 DCR 5334). Specifically, the tenants argue that the Commission erred in

I.

Tiber Island and Carrollsburg Square are large apartment complexes which were constructed during the 1960's as part of the redevelopment of the Southwest Urban Renewal Area—funded in part by federal grants pursuant to the Housing Act of 1949, 42 U.S.C. § 1441, *et seq.* (1970). Each complex is constructed on land leased for 99 years from the District of Columbia Redevelopment Land Agency. Under the lease agreements the landlord-developers covenanted to pay stated annual rents, all taxes, water rents and other public charges as would an owner in fee; they were given options to purchase the land; the options have not been exercised and the fee simple interest remains in the District of Columbia Redevelopment Land Agency.

Although mortgages for these properties are insured by the Department of Housing and Urban Development under Section 220 of the National Housing Act, 12 U.S.C. § 1715k (1976), neither rentals nor mortgage payments are subsidized. During 1976, average rents per unit were approximately $309 for Carrollsburg Square (with 422 apartments) and $322 for Tiber Island (with 391 apartments).

The petitions at issue here were filed with the Rental Administrator on April 29, 1977. It was alleged that the landlords were unable to earn a rate of return equal to 8% of the assessed value of the property under the formula provided by Section 204 of the Act (*see* § 45–1644(a)(3)(B)). A rental increase of 22.6% for Tiber Island and 21.8% for Carrollsburg Square was sought. A request was made for approval of a depreciation rate in excess of 2% of the assessed market value of the buildings and adjoining land, with the claim that the excess depreciation was in accord with that taken for federal tax purposes.

A hearing on the consolidated petitions was conducted before a hearing examiner on August 4, 1977. The parties presented testimonial evidence, cross-examined and introduced exhibits. At the conclusion of the hearing, the Examiner requested that the landlords submit certain additional documents to substantiate the operating costs reported in the petitions. A schedule was set for the submission of the documents and legal arguments by the parties. A week thereafter the documents were submitted. In the following week the tenants submitted written exceptions to the validity and sufficiency of the evidence, and during the remaining weeks of August and early September various legal memoranda, motions and responses were filed.

On October 27, 1977, the Rent Administrator granted increases of 14.23% at Tiber Island and 19.62% at Carrollsburg Square, rejecting the argument of the tenants that the value of the city-owned land appurtenant to the buildings could not be included in the base for computing rate of return. The Administrator granted the request for depreciation expense, finding that the expense claimed was that taken for income tax purposes. It denied the tenants' motion

to dismiss, finding that the tenants had not been prejudiced by the landlord's failure to post a registration statement or deprived of the right to cross-examine management.

On appeal by the Tenants Council, the Rental Accommodations Commission, after oral arguments on December 6, 1977, and January 3, 1978, found (on May 15, 1978) that the maximum permissible rental increase was 13.31% for Tiber Island and 17.98% for Carrollsburg Square; in all other pertinent respects the Commission affirmed the decision of the Rent Administrator. On May 31, 1978, the tenants appealed to this court, and the landlords intervened on June 6, 1978.

## II.

In this challenge to the decision and order of the Commission, petitioner argues vigorously that land owned by the District of Columbia in which a landlord has no private investment could not be included in the base for computing the landlord's return for the purpose of a hardship petition under Section 209 of the 1975 Rental Accommodations Act. *See* § 45–1649(b).[1]

The method of computing the rate of return permitted by the 1975 Act was set forth in Section 204 [§ 45–1644(a)(3)(B)] which defined the term "rate of return," as used in the formula fixing the rent ceiling, to be the "net income" (*viz.*, gross income less operating expenses, property taxes, management fee, depreciation expenses and amortized costs of capital improvements) divided by the assessed market value of the housing accommodation. *See Apartment & Office Building Association of Metropolitan Washington v. Washington*, D.C.App., 381 A.2d 588 (1977). A "housing accommodation" was defined in Section 201(e) to mean

---

1. Section 209(b), § 45–1649(b) provides:

In those cases where the rent increase permitted by Part (A) of step 3 of subsection (a) of section 45–1644 is insufficient to generate a rate of return of eight percent computed according to the formula provided in Part (B) of said step, the Rent Administrator, upon petition of the landlord and after audit of the figures and computations in the most current

registration statement, may allow such additional increases in rent as will generate a rate of return of eight percent. The Rent Administrator shall approve or disapprove such petition or any part thereof but shall not permit an increase which will generate a rate of return in excess of eight percent as of the time of the filing of the most current registration statement.

"any structure or building in the District of Columbia containing one or more rental units, *and the land appurtenant thereto."* *See* § 45–1641(e) (emphasis added).

Intervenors suggest that these definitions provide the simple answer to the issue; the earnest argument advanced by the tenants prompts us to treat the matter in more depth. We find the opinion of the Commission, characterizing and rejecting petitioner's contention, to be persuasive and comprehensive and we adopt it as our own:

> The tenants credibly argue that it is inconsistent with the purpose of rent control to grant a private landlord hardship rent increases which are based in part on property owned by the local government. It must be noted that tenants' counsel does not argue that a private landlord who long-term leases property owned by another private person or entity should be precluded from receiving a rate of return based on the full assessment of the leasehold. Nor would the limited return theory extend to donees or devisees of rental accommodations, nor to other intriguing hypotheticals which one conjures to explore the limits of a proposed rule. The tenants' claim is a narrow one. Since the city in an effort to restrain excessive rent charges has undertaken to limit landlords' returns on their investments, it would be incongruous to permit a landlord an increased return based on the city's investment.

> The argument is appealing and cannot be fully discounted by a literal reading of the rent control law. Such a reading however, is the starting point of a reasoned resolution of the tenant's claim. Hardship increases sought under Section 209 of the Act are to be computed in accordance with a rate of return formula set forth in Section 204(a)(3)(B) which provides that the "net income shall be divided by the assessed market value of the housing accommodation to determine the rate of return." The Act further provides in Section 201(e): "The term 'housing accommodation' means any structure or building in the District of Columbia containing one or more rental units and the land appurtenant thereto." That same section goes on to list use exceptions (hotels, motel or structures used for transient occupancy generally) but makes no exceptions whatever based on ownership arrangements. The sum of the provision is to clearly require, unless specifically excepted, that the rate of return is to be determined on the basis of the assessed valuation of both the land [and] improvements.

> Even though the City Council considered various ownership arrangements when it undertook to define "landlord" in Section 201(h) it only prescribed the unitary formula of Section 204 for calculating a rate of return in hardship cases. Section 201(h) offers no guidance as to whether the Council had in mind the private/public ownership distinction when it undertook to set the scope of the city's regulation of housing accommodations. Elsewhere in the Act, however, the Council clearly focused on the distinction and provided for the exemption from rent control of publicly owned and subsidized housing. It is apparent that the public/private distinction was not completely lost on the Council and consequently this Commission is constrained to uphold the use of the single formula prescribed by the Council for all hardship petitions in cases such as these where the ownership of a part of a housing accommodation is in a public agency.

> Statutory construction and interpretation are at best conjectural processes. It may well be that the City Council, in designing the Section 204 rate of return formula for hardship petitions, was fully aware of the impact its use would have on lands redeveloped under the D.C. Redevelopment Act of 1945. There was certainly an awareness of the extent of the Redevelopment Land Agency's holdings.

> Further, there are sound policy reasons, beyond a concern for the ease of administering rent control, that justify the use of a single formula. The application of a modified formula to redevelopers under the 1945 Act would have the effect of

disproportionately and retroactively lessening the security of the initial investments which were induced by the risk-sharing arrangements provided for in the leases. Additionally, lessees in such units would receive a benefit that no other tenants, not even those in public housing, would have. From a casual review of the rent roll for the accommodations in question, it is fair to surmise that if such a benefit were intended, the Council would clearly have directed it to more needy occupants of the city's rental housing. Lastly, adoption of the rate of return formula sought by the tenants would be contrary to the stated purposes of the Redevelopment Act, and to a greater extent, would discourage private development and force reliance on public and non-profit private developers where available. [Footnotes omitted.]

In reviewing the Commission's factual and legal findings, this court's role is closely circumscribed to an examination of whether the agency's conclusions were based on substantial evidence. *See* D.C. Code 1973, §§ 1–1510, 17–305. More precisely our scope of review has been stated as:

> "[T]he function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues. The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity to its reasons for the decision. There must be a demonstration of a 'rational connection between the facts found and the choice made.' ... The findings must support the end result in a discernible manner ...." [*Communications Workers of America v. District of Columbia Commission on Human Rights*, D.C. App., 367 A.2d 149, 152 (1976) *quoting from Dietrich v. District of Columbia Board of Zoning Adjustments*, D.C.App., 293 A.2d 470, 473 (1972) (citations omitted).]

We find the Commission's findings in this regard to fairly reflect the plain meaning of the Act.

After carefully reviewing all the pertinent provisions we find no suggestion supporting the tenants' construction of the term "rate of return." For this court to create distinctions between land owned by private and public entities would contravene the City Council's express and unqualified pronouncement of how it desired rent control under the 1975 Act to operate. This we decline to do. We hold that the Commission did not err in including land owned by the city in the formula used to determine a landlord's eligibility for hardship rental increases.

### III.

Petitioner urges further that the Commission impermissibly sanctioned the taking by the landlords of excessive depreciation exceeding assessed market value, and in so doing violated its own regulations. We are directed to then-Section 2.35(c)(1) of the Commission's regulations which, read in a vacuum, is supportive of the tenants' contention. That the issue appears at first blush to be a close one is evidenced by the Commission's equally divided vote which left standing the Administrator's allowance of depreciation, and the Commission's disavowal that such vote did not adopt the interpretation which it found necessary to avoid the appearance of irrational decision-making.

Before turning to the regulations, however, we deem it prudent to set forth the provisions of the 1975 Act which defined the amount of allowable depreciation.

Section 204(a)(3)(B) provided that, for the purpose of computing net income (in the course of computing a rate of return) the landlord should subtract *inter alia*:

> (iv) depreciation expenses (computed on a straight line basis) of no more than two percent of the assessed market value of the housing accommodation ... deducted in any one year as a depreciation expense, *unless and to only the extent any additional amounts are approved by the Rent Administrator pursuant to Subsec-*

*tion (c) of Section 205 of this Act. ... [Emphasis added.]*

Turning to Section 205(c):

Where, in the computation of a rate of return, a landlord seeks to deduct depreciation expenses in excess of two percent of the assessed market value of the housing accommodation, he shall first file with the Rent Administrator a petition to allow such excess to be deducted. If the Rent Administrator determines that such excess or part thereof is justified, he may permit to be deducted the same or so much thereof as he determines to be justified. The petition shall contain such information as the Rent Administrator may require including but not limited to what if any depreciation of the housing accommodation has been claimed for tax purposes.

We know from these express provisions that under the scheme of the Act, a landlord could exceed the standard deduction if he obtained permission to do so from the Rent Administrator. Further, it was apparent that the depreciation claimed for federal tax purposes was to be taken into consideration by the Administrator in assessing the justification for such request.

The Commission, pursuant to these provisions of the Act and its own rulemaking authority under Section 102(a)(1) of the Act, promulgated regulations making it clear that the Administrator could grant a landlord's petition to use the depreciation allowance claimed for tax purposes (using the tax return method) in lieu of the standard allowance (using the assessed value method).[2] Thus such regulations provided:

*Section 12.10. Normal Depreciation Allowance.* Subject to the option set forth in 12.20 and limitation in 12.30 [12.30 deals only with single-family houses], when calculating the rate of return of a housing accommodation the Administrator shall include as an expense an allowance for depreciation equal to 2% of the assessed market value of the accommodation.

*Section 12.20. Petition for Excess Depreciation Allowance.* In lieu of the 2% depreciation allowance under Section 12.10, the Administrator shall grant a landlord's petition to use, in calculating the rate of return of a housing accommodation, the depreciation allowance used by the landlord in calculating liability for taxes pursuant to the U.S. Internal Revenue Code where the landlord provides evidence that the useful life guidelines of the U.S. Internal Revenue Service are being followed. [Regulations of the D.C. Rental Accommodations Commission (D.C. Register, special edition, February 1977).]

■ It is without question, therefore, that under accepted interpretation of the 1975 Act a landlord, for the purposes of rent control, could elect to claim depreciation in accordance with the methods of calculation used by the Internal Revenue Service. [A problem arose in the instant case because the intervenor-landlord also elected to file a hardship petition and because the Commission had at that time a regulation specifically addressing "Administrator's Review of Landlord Hardship Petitions" (Regulation 2.35) which established guidelines

---

**2.** Commission decisions spoke of "options" which the landlord could choose and suggested that the Administrator had no discretion to overrule such choice:

We reiterate that Section 12.10 of the Regulations was intended to provide a clear option for handling the question of depreciation. The Administrator must allow *either* two percent of the total official assessed market value of the accommodations (which includes land value under the Act), *or* what the landlord claims for IRS purposes .... The Commission has previously ruled that, upon a showing that IRS guidelines are being fol-

lowed, the Administrator has no discretion to deny the landlord the depreciation expense claimed for federal tax purposes (H/P 125, 4595 MacArthur Boulevard, N.W., 7/7/76)

. . . .

Section 12.10 was adopted principally for ease of administration .... If a landlord shows that it is willing to live with IRS rules—and we can assume that deceiving IRS is at least as risky as deceiving the Rent Administrator—that should end the matter. [In Re: H/P No. 176 (101–115 North Carolina Avenue, N.E.), pp. 2–3 (RAC, Oct. 20, 1976) (emphasis in original).]

for the Administrator, *inter alia*, in calculating the rate of return under Section 204 of the Act and which noted in relevant part:]

> (1) and permitting an allowance for *depreciation* pursuant to Section 204(a)(3)(B)(4)(iv) of the Act, the Administrator shall use only the most recent official assessed market value of the accommodation; provided, however, that no rent increase on account of any notice of increased assessment shall go into effect until such assessment is itself in effect. [Emphasis in original.]

■ It is this regulation which Tenants Council claims has been violated. It reads this guideline as setting the limits of a depreciation allowance for a landlord who files a hardship petition. Intervenors and the government, however, argue that Regulation 2.35 is applicable only when a landlord has elected to take assessed value depreciation—that it has no relevance and thus no applicability when the landlord, as here, elected to utilize the tax return method of depreciation.

■ We are persuaded by the latter interpretation. To hold otherwise would render Regulations 12.10 and 12.20 meaningless—a result to be avoided whenever reasonably possible. *See* Sands, Sutherland on Statutes and Statutory Construction § 46.06 (4th ed. 1973). Moreover, the reference in Regulation 2.35 to Section 204 of the Act is consistent with the statutory scheme that 204 authorize the standard assessed value allowance and 205 the resort to tax return allowance. If the legislature had intended that a landlord who filed a hardship petition was restricted to one option in calculating depreciation it could have directed so, indeed as it has subsequently done.[3]

■ Where the Commission's interpretation of the allowable depreciation permitted by its statute has been reasonable in light of statutory purpose, we have consistently upheld such interpretation even though a computation may differ from other methods of computation. *See 1880 Columbia Road N. W., Tenants' Association v. Rental Accommodations Commission*, D.C.App., 400 A.2d 333 (1979); *Tenants of 3039 Q Street, N. W. v. District of Columbia Rental Accommodations Commission*, D.C.App., 391 A.2d 785 (1978). We hold that the Commission properly permitted the landlords to use the depreciation allowance shown on their federal tax returns.

### IV.

Finally, we reject the tenants' assertion that the landlords' hardship petitions were improperly granted in the face of procedural irregularities.

■ A. Faced with the argument that the Hearing Examiner improperly held the record open for post-hearing submission of documents, the Commission properly noted that the practice, when coupled with full opportunity for opposing parties to comment, facilitated the ends of the Administrative Procedure Act without derogating any express provision of the Act.

In proceedings such as the present, where the inquiry centered on a complex of over 800 units, and where documentation of costs incurred requires extensive review, the option of post-hearing submission and challenge operated to preserve the fundamental rights of both parties.[4]

■ B. As to the tenants' assertion that the landlords were not entitled to any increase because they failed to comply with

---

3. *See* the Rental Housing Act of 1977, D.C. Law § 2–54, March 16, 1978 § 212 (D.C.Code 1973, Supp. VII § 45–1693) where the formula for calculating rate of return pursuant to a hardship petition lists "depreciation expenses (computed on a straight line basis) of no more than two percent (2%) of the assessed value of the building as determined by the Mayor; no de-

preciation may be deducted for the value of the land."

4. Under Section 3.21 of the Commission's regulations, the Tenants could have subpoenaed the landlords' books and records well in advance of the hearing. These subpoena rights were not exercised.

the Act's registration requirements,[5] the Commission reasoned:

> We have previously ruled that a failure to post the registration mandates neither dismissal of hardship petitions nor rent rollbacks. *See* H/P 182, RAC 12/30/76. Further, in T/P 563, RAC 8/11/77, we interpreted 204(e) as merely prohibiting rent increases until such time as appropriate action is taken. Here there is no contention that the statement was not available in the project manager's office and there was an express acknowledgement that tenants received copies of the hardship petitions which are themselves registration statement updates.

We find the Commission's decision on this matter to be reasonable. Evidence was adduced at the hearing that the landlord kept a copy of the registration form posted in the resident manager's office. Even if this method of providing notice does not comply with the literal meaning of § 45–1644(e), we hold that it substantially and sufficiently comports with the intent of the Act.

Finding no reversible error, we affirm the decision and order of the Rental Accommodations Commission.

*Affirmed.*

---

5. Under § 45–1644(e) the rent for any housing unit may not exceed the base rent unless the building is registered as provided in § 45–1642.

A landlord must post a copy of the registration form in a public place in his building or he may send a copy to each tenant. *See* § 45–1642(d).