Aarno LIUKSILA, Petitioner,

v.

DISTRICT OF COLUMBIA RENTAL
HOUSING COMMISSION,
Respondent.

Watergate Management
Corporation, Intervenor.

No. 84–1545.

District of Columbia Court of Appeals.

Argued Sept. 30, 1985.

Decided Jan. 22, 1986.

Aarno Liuksila, pro se.

Charles L. Reischel, Deputy Corp. Counsel, Inez Smith Reid, Corp. Counsel, and John H. Suda, Principal Deputy Corp. Counsel, Washington, D.C., were on the Memorandum submitted in lieu of brief for respondent.

Howard N. Feldman, Washington, D.C., with whom Jeffrey M. Johnson, Washington, D.C., was on the brief for intervenor.

Before NEWMAN, BELSON, and STEADMAN, Associate Judges.

NEWMAN, Associate Judge:

██ In this petition for review of an order issued by the District of Columbia Rental Housing Commission (RHC), Liuksila, a tenant, challenges the agency's affirmance of a hardship rental increase petition filed by the landlord's agent, Watergate Management Corporation (Watergate), pursuant to the Rental Housing Act of 1980. *See* D.C. Code § 45–1501, *et seq.* (1981). Liuksila argues that the RHC erred in sustaining the Hearing Examiner's allowance of the landlord's ground lease expenditures in the calculation of both equity and net income deductible expense allowances to determine eligibility for a rent increase under D.C. Code § 45–1523 (1980).[1] Specifically, the Hearing Examin-

---

1. Liuksila also contends that the RHC erroneously interpreted the hardship provision of § 45–1523 to include single co-op units, when the statute only contemplates "housing accommodations" which are defined by the code as "any structure or building in the District of Columbia containing 1 or more rental units and the land appurtenant thereto." D.C. Code § 45–1503(8) (1980). We reject such a contention; the decision to apply the hardship provi-

sion to single unit landlords is not inconsistent with the purpose of rent control or this specific provision.

The scope of the hardship provision permits the RAO to allow an increase in rents such that a *landlord* receives a 10 percent rate of return on equity. For purposes of defining who is entitled to the benefits of this provision, we find that the RAC's flexible interpretation of the lan-

er allowed the landlord to deduct, as an operating expense, the landlord's ground lease expenditures and at the same time to include in the landlord's equity the assessed value of the land owned by the ground-lessor. Liuksila contends that the dual inclusion of ground lease expenditures in the calculations was tantamount to charging the tenant (Liuksila) twice for the same expenditure (i.e., for the landlord's acquisition cost and for the value of the leased property). Because the record does not contain any supportive authority or reasonable rationalization for the agency's dual inclusion of the ground lease expenditures, we remand the matter to the RHC for a detailed justification of the Commission's inclusion of such amounts in both the equity and operating expense categories of the petition.

## I

The hardship petition in question was filed pursuant to D.C. Code §§ 45–1517(c), –1523 (1981), requesting a 50 percent upward adjustment of the rent ceiling for unit 417 at 700 New Hampshire Ave., N.W.[2] A petition of this type permits the District of Columbia Rent Administrator to allow an increase in rents so that the landlord may receive a 10 percent rate of return on equity as calculated according to D.C. Code § 45–1523(b). Under this section the petitioner must submit a calculation of current equity divided by the net income derived from the housing accommodation ("rate of return") for which he seeks a rental increase. In order for the rent adjustment to be granted, the figures must demonstrate that the rate of return is less than 10 percent of the landlord's total equity in the property.[3]

### A. Calculation of Equity

In support of the hardship petition, Watergate contended before the Hearing Examiner that the total equity in the unit was $85,868.15. The equity figure was derived by first determining the current assessed value of the unit. This amount was calculated by multiplying the then current assessed value of the cooperative building as a whole, including the assessed value to the ground lessor of the leased land upon which the building was built, a total of $27,914,160, by the percentage of ownership attributable to the unit in the whole building, .42480%.[4] This resulted in an as-

guage set forth in §§ 45–1523 and 1503(8) is reasonable.

Any person with an equity interest in a "building in the District of Columbia which contains one *or* more rental units ..." D.C. Code § 45–1503(8) (emphasis added), may qualify as a "landlord" for the purposes of the benefits under § 45–1523 of the Code. Furthermore, single unit landlords are expressly restricted from benefits in companion sections under Chapter 45, thereby suggesting that the drafters of § 1503(8) intended for single unit owners to be implicitly included despite the fact that no express reference is made to them therein.

2. The unit is one of several cooperative units owned by Lionel C. Epstein, in the Watergate South Cooperative. Watergate Management Corporation (landlord-intervenor) manages these units for Mr. Epstein.

3. D.C.Code § 45–1523(b) (1981) sets forth the formula to be used in determining the rent adjustment necessary to permit a landlord to receive an allowable rate of return. The rate of return generated by a given rent level is calculated by dividing a landlord's net income, com- puted over a base period of the consecutive months within fifteen months preceding the filing of the petition, by the landlord's equity in the property. The net income is derived by subtracting operating expenses, management fees, property taxes, depreciation expenses, vacancy losses, uncollected rents, and interest payments, from the landlord's maximum rental income and other income from the property. D.C. Code § 45–1523(b)(1)(A)–(G) (1981).

4. Watergate explained that the percentage of ownership attributable to the unit is a number assigned by the Cooperative to the unit for use in the Cooperative's internal affairs. It was calculated by comparing the unit's original mortgage allocation, $41,300 (which is approximately one-half of the original purchase price of the unit), to the total of all other original mortgage allocations for the units and garage spaces in the Cooperative, which sum totalled $9,722,-200. After dividing each number by 100, the unit represents 413 shares of the total 97,222 shares in the Cooperative, or a .42480 percent share of the Cooperative. This figure determines the voting power represented by the unit

sessed value of the unit totaling $118,-579.35. From the assessed value of the unit so calculated, the total encumbrances [5] on the unit were subtracted to derive an equity figure of $85,867.85.

## B. Calculation of Deductible Expenses and Net Income

The net income on the unit at the time of the hardship petition was set forth by Watergate as follows: The maximum rental income ("gross income") derived from the unit during the relevant reporting period was $13,455.12. Under § 45-1523(b)(1)(A), a landlord's "operating expenses" may be deducted from the maximum rental income to determine current net income.[6] Accordingly, Watergate proposed two methods for deriving the deductible "operating costs." The first approach comprised a quantification of the total monthly assessments on the unit, resulting in a total net income of $1,779.52; the second approach involved a percentage allocation of the landlord's share of the cooperative's certified expenses, resulting in a net income of $1,558.41.[7] Watergate concluded that regardless of which method the Hearing Examiner adopted, the return of equity on the unit would fall below the 10 percent rate to which Watergate, as landlord, is entitled. Under the total monthly assessment approach it was necessary to increase the then present net income of $1,779.52 by $6,807.54 to provide a net income of $8,586.82 representing a 10 percent rate of return. Under the percentage allocation approach it was necessary to increase the then present net income of $1,558.41 by $7,010.41 to provide the 10 percent return of equity.

The Hearing Examiner issued an order granting a 47.67 percent rent increase to Watergate. The Hearing Examiner found that the gross income during the relevant reporting period for the unit was $13,-455.12. In reaching such a conclusion as to

in the total cooperative enterprise and also is used to determine the amount of the monthly assessment placed against the unit.

5. As encumbrances, the landlord listed the principal balance outstanding on the mortgage of the unit. Although line 31 of the hardship petition states that the total encumbrances on the unit were $33,650.11, at the hearing landlord explained that the total encumbrances were actually $32,711.50, thus resulting in the equity figure of $85,867.85.

6. There are several other categories of deductible items detailed in § 45-1523(b)(1)(A)-(G), see supra note 3; however, the present case involves only deductions taken under the "operating expense" category to derive net income.

7. Under the total monthly assessment approach the landlord included in the total deduction [operating expenses] ($11,675.60) the sum of the: (1) management fee ($269.16); (2) insurance cost ($21.95); (3) Rental Accommodations Office Fee ($6.00); (4) repair costs ($8.40); (5) "miscellaneous expenses" ($9,335.40); and (6) mortgage interest payments ($2,034.69). The landlord explained that the owner of a unit in a cooperative association is not billed separately for items such as utilities, supplies, payroll taxes, license fees, ground leases, real estate taxes, security, and salaries and wages. Rather, the cooperative association is billed as a whole and pays these bills from the funds provided to it by unit owners through their monthly assessments; the "miscellaneous expenses" represented (12) times that portion of the monthly cooperative assessment not attributable to mortgage, principal or interest ($777.95). The landlord further explained that after subtracting the total operating expenses ($11,675.60) from the gross income ($13,455.12), the net income derived from the rental property during the reporting period of $1,779.52.

Under the percentage allocation approach the landlord's total operating expenses ($11,896.71) included the sum of the: (1) management fee ($269.16); (2) insurance cost ($21.95); (3) Rental Accommodations Office Fee ($6.00); (4) repair costs ($8.40); (5) the unit's percentage share of the cooperative's certified expenses ($8,225.60; (6) the unit's percentage share of the cooperative's real estate tax bill ($1,330.91); and (7) mortgage interest payments ($2,034.69). The landlord explained that after subtracting the total operating expenses ($11,896.71) from the gross income ($13,455.12 plus $422.42, which represents the unit's percentage share of Cooperative's miscellaneous income of $99,440), the net income from the rental property during the reporting period was $1,980.83. However, at the hearing, the examiner noted that the landlord incorrectly included the additional income of $422.42; therefore, after corrections, the net income under the percentage allocation approach was $1,558.41.

the rent increase, the total monthly assessment approach was adopted by the Examiner for the purpose of determining the total operating expenses and calculating net income. Under this method, the Examiner concluded that the total deductible [operating] expenses were $11,669.60, thereby resulting in a net income figure of $1,785.52.[8] The deductible operating expenses included, among other things, allowances for ground lease expenses incurred by Watergate. The Examiner also noted that Watergate's method of calculating equity was not unreasonable and adopted, with slight variation, the percentage share assessment calculation set forth in the petition as a means of determining the assessed value of the unit to be $114,700.59.[9] The Examiner included in the calculation of the unit's assessed value, a percentage valuation of the leased ground upon which the cooperative building is located. From this, the Examiner concluded that Watergate's equity in the unit totaled $81,989.09. Accordingly, the Examiner determined that the rate of return on the unit was only 2.18 percent, thereby entitling Watergate to a 47.67 percent rent increase in order to realize a 10 percent rate of return under D.C. Code § 45–1523(a).

Liuksila filed a motion for reconsideration of the Examiner's decision; the motion was denied. Mr. Liuksila filed an appeal with the RHC pursuant to D.C. Code § 45–1527(g). A hearing was held before the RHC; it issued an order affirming the rent increase. Liuksila filed a motion for reconsideration; it was denied. This Petition for Review followed.

## II

■ Where a landlord seeks to obtain a rent increase by a hardship petition pursuant to D.C. Code § 45–1517(c) (1981), the burden of proof rests upon the proponent of the petition. *See* D.C. Code § 1–1509(b) (1981). The quantum of evidence produced must establish that the expense data (i.e., rate of return) cited in the petition is accurate. *See Wire Properties v. District of Columbia Rental Housing Commission*, 476 A.2d 679, 682 (D.C.App.1984); *Chapin Street Joint Venture v. District of Columbia Rental Housing Commission*, 466 A.2d 414, 415 (D.C.App.1983) (per curiam). The agency's administrative factfinder (Hearing Examiner) is obligated to evaluate the proffered evidence and determine whether it is sufficient to support a rent adjustment. Our scope of review has been defined as follows:

> [T]he function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues. The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity to its reasons for the decision. There must be a demonstration of a "rational connection between the facts found and the choice made." ... The findings must support the end result in a discernible manner....

*Tenants Council of Tiber Island-Carrollsburg Square v. District of Columbia Rental Accommodations Commission*, 426 A.2d 868, 872 (D.C.App.1981) (quoting *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights*, 367 A.2d 149, 152 (D.C.App.1976). *See Liberty v. Police and Firemen's Retirement and Relief Board*, 410 A.2d 191, 192–93 (D.C.App. 1979) (citing *Morgan v. District of Columbia Police and Firemen's Retirement and Relief Board*, 370 A.2d 1322, 1326 (D.C.

---

**8.** Apparently there were no further deductions taken under any of the remaining categories of allowing deductions set forth in § 45–1523(b)(1)(A)–(G), and therefore the net income was derived by simply subtracting the total deductible operating expenses from gross income.

**9.** The Hearing Examiner determined the assessed value of the unit by averaging the assessed value of the cooperative as a whole for the 1983 tax year ($27,914,160) and the value for the 1982 tax year ($26,088,000), and multiplying this average by the unit's percentage share (.42480%).

App.1977)); *see also* D.C. Code §§ 1–1510, 17–305 (1981).

Based upon the administrative record in the present case, serious questions exist concerning the validity of the methods used by the RHC in calculating the current rate of return on property for which a rent adjustment is sought under D.C. Code § 45–1517(c) (1981).[10] The record is void of any supportive authority or rationale for the agency's allowance of what appears to be dual ground lease calculations in determining eligibility for a rent increase. Therefore, we remand the case to the RHC for further explication, specifically the apparent dual inclusion of ground lease expenditures used in determining the entitlement of the landlord to a rent increase.

*Remanded for further proceedings not inconsistent with this opinion.*

---

10. We do not independently question the inclusion of ground lease expenditures to determine the assessed value of the unit (equity). This court has expressly upheld the inclusion of leased land in the landlord's value determination of equity in a Hardship Petition for rent increase as permissible, at least under a prior version of the law. *See Tiber Island, supra,* 426 A.2d at 871. However, there remains an unresolved question of whether ground lease expenditures may be included in both the calculation of equity *and* net income deductible [operating] expenses to determine a landlord's eligibility for a rent increase under the Code.