**DISTRICT OF COLUMBIA GENERAL HOSPITAL, Appellant,**

v.

**DISTRICT OF COLUMBIA OFFICE OF EMPLOYEE APPEALS and Geraldine Gaines, Appellees.**

No. 87–356.

District of Columbia Court of Appeals.

Submitted May 16, 1988.

Decided Sept. 16, 1988.

Leonard L. McCants and Mariea R. Cromer, Washington, D.C., for appellant.

Sharon P. Banks, Chairperson of the District of Columbia Office of Employee Appeals, Washington, D.C., entered an appearance for appellee District of Columbia Office of Employee Appeals.

Cecilie A. Vaughters–Johnson, Washington, D.C., for appellee Geraldine Gaines.

Before MACK, NEWMAN, and BELSON, Associate Judges.

BELSON, Associate Judge:

Appellant, District of Columbia General Hospital ("D.C. General"), appeals from an adverse ruling of the Superior Court in its review of a decision by the District of Columbia Office of Employee Appeals ("OEA"). The Superior Court upheld OEA's determination that D.C. General failed to carry its burden of proving that appellee, Geraldine Gaines, a security guard at the hospital, was guilty of dishonesty. On appeal, D.C. General's principal contentions are that (1) the OEA final order is invalid because it was issued by a hearing examiner who had replaced the examiner who actually had heard the testimony, and (2) the OEA decision is not supported by the evidence adduced at the hearing. Although we conclude that D.C. General waived challenge to the substitution of hearing examiners by failing to raise this issue earlier in these proceedings, we hold that the evidence adduced in the administrative hearing is not adequate to support OEA's decision in favor of Gaines. Accordingly, we reverse.

## I.

On December 17, 1982, Geraldine Gaines, employed as a security guard at D.C. General Hospital, was dismissed on charges of dishonesty[1] flowing from an August 1982 incident involving a $150.00 money order taken from Larry Bowden's lost or stolen wallet. Gaines appealed her dismissal to the Office of Employee Appeals, and the facts set forth below were adduced at an evidentiary hearing.

Bowden went to D.C. General around 8:00 a.m. on August 16, 1982. Some time after he left the hospital he realized that he was no longer in possession of his wallet, which contained a blank money order for $150.00. Gaines had been on duty at the hospital since 7:30 a.m. Later that day, the wallet, but not the money order, was recorded in the hospital's lost and found log. No name appeared indicating who had found the wallet and turned it in; Gaines denied that she recorded the entry.

Bowden reported the loss to the police, and telephoned the money order company in order to stop payment. The company informed Bowden that it did not have a stop payment policy, but that if he could provide the serial number of the money order, for a two dollar fee the company would mail him a copy of the money order if and when it was cashed. Bowden did not know the number of the money order so he went back to the convenience store where he had purchased it, along with a second one for $50.00, the previous day. Bowden knew the serial number of the $50.00 money order because he had already spent it and retained a receipt which bore the serial number. The clerk at the convenience store readily determined which two money orders Bowden had purchased because the store maintained a log of money order sales in which the clerk would write the date of purchase, serial number, and money order amount. Only one money order had been sold in each of the two amounts purchased by Bowden, and Bowden had the serial number for the $50.00 money order, so it was simple to determine the serial number of the $150.00 money order. At Bowden's request, the store's manager reviewed the log to confirm that only one money order each had been sold in the amounts of $50.00 and $150.00.

About a week later, Bowden received a photocopy of the cashed $150.00 money order bearing the serial number Bowden had supplied to the company. The money order bore the name of the individual who cashed it, Benjamin Andrews. Bowden soon ascertained that Benjamin Andrews was an employee of D.C. General Hospital. Bowden turned this information over to the police and explained to Officer Pauline Howard that he was not interested in pressing charges, but only in getting his money back.

Officer Howard contacted Benjamin Andrews, who stated that on August 17, 1982, Gaines gave him a blank $150.00 money order which she asked him to cash. Gaines had worked for Andrews in the hospital housekeeping department before she joined the security force. Officer Howard and Roy Bowden,[2] Hospital Investigator at D.C. General, then met with Gaines. Officer Howard read Gaines her rights and, according to Bowden, Gaines stated that the money order was "sent to her ... in the mail from her child's father for child support. That's how she came about the money order." Officer Howard asked if Gaines could provide the telephone number of the child's father to verify his having sent the money order, and Gaines gave Officer Howard a phone number to call but nobody answered the phone.[3] Officer Howard

---

1. D.C. General Hospital Regulation No. 108–4 provides that a permanent employee may be "removed from the Hospital only for cause. Cause is defined as ... (6) Dishonesty." *See* D.C.Code § 1–617.1(d)(6) (1987).

2. There does not appear to be any relationship between Larry Bowden, who lost his wallet, and Roy Bowden, D.C. General Hospital Investigator.

3. On direct examination, Gaines testified that prior to this incident she had received child support payments in the form of "cash and money orders...." Asked whether Gaines had "any way of contacting [the child's father]," Gaines replied, "No, I didn't." Indeed, at no time during these proceedings has Gaines identified the father by name.

then told Gaines that Larry Bowden stated that if restitution was made of the $150.00, he would not press charges. Subsequently, Officer Howard arranged a meeting between Gaines and Larry Bowden and, according to Bowden, Gaines said something to the effect that she "believed that it was a misunderstanding that the money order— in which the $150.00 money order was given to her by an associate in reference to a child support payment."

Gaines testified that she got the money order "from my daughter's father for child support," and that she first received it when she went home to check her mail during her lunch hour on August 16. Other testimony by Gaines and the testimony of Andrews support the hearing examiner's finding that Gaines indicated the time of receipt as August 17th, rather than August 16.[4] Gaines asked Andrews to cash the money order because, by the time she returned from checking her mail, her lunch hour was over but Andrews was just beginning his and was willing to cash it. Gaines testified that she agreed to pay the $150.00 to Bowden because she "had a nine year-old daughter at home and if he had prosecuted, not saying that he would have, then that meant they would have to lock me up and I probably would have lost my commission and my job. Because I had just gotten a waiver to get my commission."[5] Asked to explain how it was possible that she received in the mail on the 16th a money order Bowden had himself only purchased on the 15th and lost on the 16th, Gaines replied, "I don't know. But it only takes one day for mail to go. If you drop your

mail in by 5:00 this evening, you will have it tomorrow morning."

The proceedings that led to this appeal began shortly after D.C. General terminated Gaines' employment on the basis of dishonesty. On December 27, 1982, Gaines appealed the hospital's decision to the Office of Employee Appeals ("OEA"), and hearings were held on October 18 and November 6, 1984. By letter dated April 16, 1985, OEA advised the parties that the case had been reassigned to a substituted hearing examiner because the original examiner had resigned. The letter stated that

> the fact that cases are being reassigned does not mean that the entire adjudicatory process will begin anew. In some appeals, the record is complete and no further proceedings or documents will be required. In other cases, additional information or supplemental proceedings may be required.

By initial decision dated August 5, 1985, which became final on August 20, 1985, the OEA reversed the hospital's dismissal of Gaines, ordering that she be reinstated with all salary and leave benefits. Notably, D.C. General raised no objection to substitution of hearing examiners throughout the nearly four months between the April letter and the August decision of the substituted hearing examiner.

D.C. General subsequently filed a petition for review in Superior Court, and it was during oral argument before the trial court that the hospital raised for the first time the issue of substitution of examiners.

---

4. Some confusion exists as to the exact date Gaines received the money order. Although the hearing examiner concluded that she received it and gave it to Andrews on August 17, Gaines herself testified as follows:

Q. When did you receive it, what day?
A. It was about the 16th.
Q. You received it on the 16th?
A. Yes.
Q. You also stated—
A. I think, yes, maybe. I don't know.
Q. Could you take some time to remember?
A. God. Yes, it was the 16th. Because I remember going home for lunch that day. It was the 16th.
Q. When did you give it to Mr. Andrews to cash?

A. The 16th.
Gaines never testified that she found the money order in her mailbox on August 17. The hearing examiner apparently based her finding that she did so on Ben Andrews' testimony that he received it from Gaines and cashed it on August 17, together with Gaines' testimony that she gave it to Andrews to cash shortly after she received it.

5. Gaines testified that a commission is a license that permits a special police officer to detain and arrest people. She needed a waiver in order to obtain the commission because, she said, in 1973 she had been tried and convicted of assault, for which she served fourteen months in prison.

At the conclusion of the hearing, and in light of this new issue, the trial court determined to remand the case back to OEA for "an explanation as to why a different hearing examiner was assigned to decide the case than was assigned to hear it and I want the agency to address the question of whether that was legally justified."[6]

Pursuant to the trial court's remand, OEA reviewed its procedure and found that (1) substitution of hearing examiners is permissible where the decision does not turn on determinations of credibility; (2) resolution of the instant cases did not turn on determinations of credibility; and (3) in any event, D.C. General had waived its objection to substitution of hearing examiners by failing to make timely objection. On February 6, 1987, the trial court upheld OEA's determinations on remand, concluding that "[w]hile the Court still has grave doubts about the validity of the procedure used by OEA, the Hospital never objected to its use and thereby waived all objections to it" (footnote omitted). This appeal followed.

## II.

■ D.C. General's first argument on appeal is that because the final OEA decision involved the credibility of witnesses, it was entitled to a *de novo* hearing upon the substitution of hearing examiners. Appellee Gaines argues that D.C. General waived challenge to this issue by not raising its objection prior to issuance of the new examiner's final decision. At the outset, we note that our standard of review in considering these arguments is not affected by the fact that this appeal is taken from a decision of the Superior Court, rather than directly from an agency decision: "[w]e conduct the identical review that we would undertake if this appeal had been heard initially in this court." *Kegley v. District of Columbia,* 440 A.2d 1013, 1019 (D.C. 1982).

In *Stevens Chevrolet, Inc. v. Comm'n on Human Rights,* 498 A.2d 546 (D.C. 1985), this court stated the general rule that "[w]hen the examiner has become unavailable, courts have uniformly required a hearing *de novo* whenever the agency's decision depends to any extent on the credibility of witnesses." *Id.* at 549. Accordingly, a new hearing is required "whenever a hearing examiner becomes unavailable without first reporting his or her initial decision back to the agency, unless the agency can demonstrate that the credibility of witnesses plays no part in the agency's decision." *Id.* at 550. Yet in *Stevens Chevrolet* and the cases cited therein, there *was* objection to the substitution of hearing examiners before the decision of the new examiner became known. *E.g., Gamble–Skogmo, Inc. v. Federal Trade Comm'n,* 211 F.2d 106, 110–11 (8th Cir.1954) (FTC denied corporation's motion "to require the substitute trial examiner to engage in a de novo hearing, in order that he thus would have the opportunity to see and hear the numerous opposing witnesses involved and be able to evaluate their credibility upon this basis"); *Van Teslaar v. Bender,* 365 F.Supp. 1007, 1012–13 (D.Md.1973) ("Van Teslaar did not agree to proceed without a *de novo* administrative hearing. His attorney clearly objected to the substitute examiner merely reading the record of the testimony of the witnesses who had appeared before the prior examiner."). Indeed, in *Gamble–Skogmo, supra,* the Eighth Circuit distinguished previous cases cited by the appellant therein from the case then under review precisely because in those other cases the parties below *had* objected to the substitution of hearing examiners. *Gamble–Skogmo, supra,* 211 F.2d at 115; *see Pigrenet v. Boland Marine & Mfg. Co.,* 656 F.2d 1091, 1095 (5th Cir.1981) (en banc) ("[N]ot one of these cases [cited by appellant] ... holds that a party may raise as error on appeal a [substitute] fact-finder's decision not to hold such a hearing when

6. The trial court also remanded to OEA the question of whether OEA possessed authority to award attorneys' fees. The trial court subsequently held, on the basis of this court's ruling in *District of Columbia v. Hunt,* 520 A.2d 300 (D.C.1987), that OEA possessed the authority to award attorneys' fees and that an award of attorneys' fees was justified in the instant case.

the party fails to object to the procedure at the fact-finding level.").

■ By contrast, in the instant case neither party objected to the substitution of hearing examiners until after the decision of the replacement examiner became known. The parties were advised by letter dated April 16, 1985, that OEA would be substituting hearing examiners. Gaines argues that by not objecting to the substitution of hearing examiners before issuance of the replacement examiner's decision, D.C. General waived objection to this procedure. We agree. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United ed States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). The rationale of such a general rule is that "[p]rocedural objections to the action of an administrative agency or trial court must be timely made to give the tribunal an opportunity to correct the error, if error there be." *Brotherhood of R.R. Trainmen v. Chicago, Milwaukee, St. P. & Pac. R.R.,* 127 U.S.App.D.C. 58, 61, 380 F.2d 605, 608, *cert. denied,* 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967).

The instant case is similar to *Millar v. Federal Communications Comm'n,* 228 U.S.App.D.C. 125, 707 F.2d 1530 (1983). In *Millar,* two separate sets of administrative hearings were held before an examiner who then retired before issuing a decision. A substitute examiner was appointed, no further testimony was taken, and "[n]o objection was made to the substitution of hearing examiners." *Id.* at 129, 707 F.2d at 1534. The D.C. Circuit, noting that "[o]ther courts have held that the lack of a timely motion to have a substitute hearing examiner rehear testimony will be construed as a waiver of the objection," concluded that "appellants' failure to raise be-

fore the substitute examiner the question of rehearing testimony constituted a waiver." *Id.* at 132–33, 707 F.2d at 1537–38 (citing *Pigrenet, supra,* 656 F.2d at 1095 ("We have previously held that a party, in order to preserve the issue for appeal, must object at the fact-finding level to a substituted fact-finder's failure to conduct a new evidentiary hearing."); *Braswell Motor Freight Lines v. United States,* 271 F.Supp. 906, 908–11 (W.D.Tex.1967) (three judge district court) (plaintiff's objection to substitution of examiners midway through hearings was untimely where not made until ten months after the replacement, once substitute examiner had filed his report)).

In its opinion on remand, OEA reasoned that its letter of April 16, 1985, had put the hospital on notice that a rehearing was not automatic upon reassignment of hearing examiners, and that if the hospital wished to object to a decision without a rehearing before the replacement examiner, it should have objected at the time of the substitution. D.C. General's response to this argument is not persuasive. In its brief, D.C. General cites various inapposite criminal cases standing for the proposition that "courts indulge every reasonable presumption against waiver of fundamental rights and do not presume acquiescence in the loss of fundamental rights." Brief of Appellant at 11 (citing *Taylor v. United States,* 99 U.S.App.D.C. 183, 185, 238 F.2d 259, 261 (1956)). D.C. General then argues that this court must consider the case in light of the particular circumstances of this case, *viz.,* that at the time of the hearing "the Hospital was represented by an administrative staff member, not by current counsel. At the time of the OEA reassignment to an alternative hearing examiner, it was not anticipated by the Hospital representative that a formal objection to the OEA substitution was necessary to preserve its rights" to challenge this procedure on appeal.[7] Brief of Appellant at 12. We note simply that while it may indeed have been to D.C. General's disadvantage that it apparently assigned a nonlawyer to

---

7. In her brief, Gaines avers that the hospital's "representative throughout the proceedings" (one Ms. Lavedas) was "a graduate of law

school and presumably experienced in the legal profession." Brief of Appellee at 24.

represent its interests in the instant case, there exists no good reason for penalizing the employee for this decision by D.C. General. Furthermore, the record before us discloses no basis for believing that the letter sent to D.C. General, advising of the substitution of hearing examiners, was not available to the hospital's legal counsel. If the letter was not shared with counsel upon receipt, certainly it should have been; the fact that D.C. General's internal procedures regarding employment disputes may have been flawed should not prejudice the employee. Lastly, appellant argues that there was "a high degree of ambiguity in the April 16, 1985, letter notifying the parties of the reassignment." Brief of Appellant at 13. We disagree. The letter notified the parties quite clearly that in a case, like the instant case, where the administrative record was complete, the office intended to conduct no further proceedings. Prior to receiving the letter advising of a substitution of hearing examiners, both parties had received from OEA an "Order Closing the Record" which stated, "[o]nce the record is closed, no additional evidence or argument shall be accepted into the record except upon a showing that new and material evidence was not known or available prior to the closing of the record, and reasonable effort had been made to obtain it."

We conclude that D.C. General cannot attribute its decision to stand silent rather than challenge the substitution of hearing examiners to any failure of notice or other defect in the proceedings before OEA. "[T]he issue was an obvious one for appellant to raise if [appellant] thought it worthwhile." *Anaya v. Romero,* 627 F.2d 226, 228 (10th Cir.1980) (failure to object to entry of proposed findings by magistrate who did not hear the evidence constitutes waiver), *cert. denied,* 450 U.S. 926, 101 S.Ct. 1380, 67 L.Ed.2d 356 (1981). D.C. General was finally prompted into action not because of its discovery of the substitution of hearing examiners but because it did not agree with the decision issued by the examiner. While we do not suggest that D.C. General purposely withheld challenge in order first to see whether it received a favor-

able decision from the substitute examiner, the possibility that some future litigant might adopt such a strategy is not unrealistic. It is obvious that "[i]t will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor. A contrary rule [permitting such conduct] would only countenance and encourage unacceptable inefficiency in the administrative process." *Marcus v. Director, Office of Workers' Compensation Programs,* 179 U.S.App. D.C. 89, 96, 548 F.2d 1044, 1051 (1976).

Based upon the foregoing discussion, we conclude that appellant waived challenge to the substitution of hearing examiners by not objecting before issuance of the substitute examiner's decision. In light of this conclusion, it is unnecessary for us to reach the question whether OEA's decision depended "to any extent on the credibility of witnesses," *Stevens Chevrolet, supra,* 498 A.2d at 549, and thus required a *de novo* hearing. Instead, we proceed to appellant's second argument, *viz.,* that the OEA decision is contrary to the weight of the evidence.

### III.

Following termination of her employment, Gaines filed an appeal with OEA, and in response to the appeal D.C. General both explained and defended its action as follows:

Ms. Gaines was found to be dishonest in that she was responsible for the cashing of a money order that was later determined to have been in a wallet that was lost or stolen on the grounds of D.C. General Hospital. Ms. Gaines in her October 7, 1982 statement asserts that the money order was mailed to her several months earlier by her boyfriend. However, the purchaser of the money order, Larry Bowden, states that the money order was lost or stolen on August 16, 1982 and the money order was subsequently give [sic] to Ben Andrews by Ms. Gaines to cash on August 17, 1982. It is not possible that Ms. Gaines could have received in the mail on August 17, 1982 a

money order that was lost the previous day.

This statement embraced D.C. General's theory of Gaines' dishonesty.[8] Yet OEA, in its opinion on remand, reasoned as though D.C. General had based its argument primarily on asserted circumstantial evidence tending to link Gaines to the wallet itself and ignored the implications of her subsequent explanation of how she came to possess it. Thus, OEA ruled against D.C. General because the hospital was unable to establish: 1) that the wallet was lost in an area accessable [sic] to Employee at the time; 2) that Employee found the wallet; 3) that Employee turned the wallet into the lost and found or; 4) that the handwriting in the entry log was that of Employee. Accordingly, OEA found, D.C. General's circumstantial evidence was "reduced to nothing more than a string of unsubstantiated allegations." The Superior Court, in a brief memorandum opinion and order, upheld OEA's decision because it found "substantial evidence to support the four key findings underlying OEA's conclusion."

It is well settled that "the function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues." *Tenants Council of Tiber Island–Carrollsburg Square v. District of Columbia Rental Accommodations Comm'n*, 426 A.2d 868, 872 (D.C. 1981) (quoting *Communications Workers of America v. District of Columbia Comm'n on Human Rights*, 367 A.2d 149, 152 (D.C.1976)). This court must determine both whether the agency's findings of fact are supported by substantial evidence, and also "whether its conclusions flow rationally from those findings." *Greater Washington Business Center v. District of Columbia Comm'n on Human Rights*,

454 A.2d 1333, 1337 (D.C.1982); *George Washington University v. District of Columbia Bd. of Zoning Adjustment*, 429 A.2d 1342, 1345 (D.C.1981). Accordingly, we may overturn an agency decision "if its findings are unsupported by substantial evidence in the record as a whole, or if it is grounded on a faulty legal premise." *Woody v. Police & Firemen's Retirement & Relief Bd.*, 441 A.2d 987, 988 (D.C.1982) (quoting *Neer v. District of Columbia Police & Firemen's Retirement & Relief Bd.*, 415 A.2d 523, 526 (D.C.1980)).

In the instant case, both OEA and the Superior Court apparently took the view that it was necessary that D.C. General connect Gaines directly with Bowden's recovered wallet as a predicate for a determination that Gaines had (1) wrongfully caused the money order to be converted to cash for her own use, and (2) then offered an untruthful story as to how she came into possession of the money order. We are persuaded this view is erroneous, and that in focusing on this aspect of D.C. General's case against Gaines both OEA and the Superior Court overlooked compelling evidence sustaining D.C. General's principal contention: that Gaines had acted dishonestly. In our view, even assuming *arguendo* that OEA was correct in concluding that D.C. General fell short of its evidentiary burden to the extent it attempted to prove that Gaines personally found the wallet, removed the money order, and then sought anonymously to record the wallet in the lost and found log, there remains the crucial fact that Gaines came to possess and then converted to her own use a recently lost or stolen money order that indisputably belonged to Bowden, and thereafter offered a wholly implausible explanation as to how she came to possess the money order.

> I am concluding that you have misrepresented the facts concerning this serious incident and am proposing your removal to maintain the integrity of the Security Section and confidence of the employees, patients and visitors we must serve. Dishonesty will not be condoned nor tolerated.

---

**8.** Furthermore, the statement comports with D.C. General's November 1, 1982, letter notifying Gaines of her proposed termination. That letter, written by the Director of the hospital's Operations Division, set forth the whole chain of events implicating Gaines, including but not limited to the circumstances focused upon by the OEA, and then stated in part as follows:

Several factors compel the conclusion that Gaines acted dishonestly with regard to the lost money order. Most important is that Gaines' account of how she came to possess the money order cannot be credited. We so conclude because, in the first place, the evidence established beyond doubt that the money order in question was not purchased by the father of Gaines' child and mailed to Gaines. Rather, it was purchased by Larry Bowden and lost or stolen, most likely at Gaines' work place where Bowden's wallet was turned in. In order to credit Gaines' account that she came into possession of the money order in the honest fashion she described, the trier-of-fact had to accept the mind-boggling proposition that some unknown person somehow came into possession of the blank money order on August 16 and, without telling Gaines anything about it, mailed it forthwith to Gaines. If the unknown benefactor was not the father of Gaines' child, this largesse is entirely unexplained. If the unknown benefactor was not the father of Gaines' child, the trier-of-fact must accept the proposition that, against enormous odds, this person with whom Gaines could not even communicate somehow came into possession of a money order lost or stolen at the hospital and, without advising Gaines, caused it to arrive at her mailbox with remarkable dispatch.

We add that it would be extraordinary, in any event, for a father to transmit child support money in the form of a blank money order, thereby creating absolutely no record of his having paid the support. Further, the short time span between Bowden's loss of the money order on August 16, and Gaines' alleged receipt of it with the mail she received on August 17 (or, as Gaines testified, August 16), hardly is sufficient to have allowed time for the father or another benefactor to have acquired Bowden's money order and mailed it in such fashion that Gaines would have received it as she claims. On cross-examination Gaines was asked about

how the U.S. mail works so well for you. Did you receive it in any special way? Was it Express Mail?

She replied, "No. It was in the mailbox with all the other mail that I get out."

For all the reasons we have stated, Gaines' version of the events cannot withstand scrutiny. It is so "highly questionable in the light of common experience and knowledge" that it was unworthy of belief. *Jackson v. United States,* 122 U.S.App.D. C. 324, 329, 353 F.2d 862, 867 (1965); *see Payne v. United States,* 516 A.2d 484, 494 (D.C.1986); *Coleman v. United States,* 515 A.2d 439, 444 (D.C.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987); *In re A.H.B.,* 491 A.2d 490, 496 & n. 8 (D.C.1985); *see also Petway v. United States,* 420 A.2d 1211, 1213 (D.C.1980); *Merriam v. Sugrue,* 41 A.2d 166, 167 (D.C. 1945). Thus, instead of supporting Gaines' account of honest possession of the money order, her implausible account lent weight to D.C. General's showing that Gaines' actions with respect to the money order bespoke dishonesty.

In light of these observations, we conclude that the hearing examiner's conclusion that,

with regard to the Agency's finding that Employee was responsible for cashing the money order, the Employee presented testimony as to how the money order came into her possession which is plausible and, contrary to the Agency's position, within the realm of possibility,

is neither supported by substantial evidence of record nor a rational conclusion flowing from the hearing examiner's findings of fact. Although "we should not disturb a decision if it rationally flows from the facts relied upon, and those facts or findings are substantially supported by the evidence," *Kramer v. District of Columbia Department of Employment Services,* 447 A.2d 28, 30 (D.C.Mun.1982), we would be derelict in allowing to stand a decision that does not rationally flow from the facts developed in the administrative proceeding. Indeed, "[w]e are required to set aside [agency] holdings if they are not supported by substantial evidence in the record." *Jadallah v. District of Columbia Dep't of Employment Servs.,* 476 A.2d 671, 676 (D.C.1984) (quoting *Hawkins v. District*

*Unemployment Compensation Bd.*, 381 A.2d 619, 622 (D.C.1977)).

On the facts before us, and for the reasons given above, we conclude that as regards the OEA decision in favor of appellees, the evidence is not such "as a reasonable mind might accept as adequate to support [OEA's] conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Accordingly, the decision on appeal, including the award of attorneys' fees, must be reversed.

REVERSED.

MACK, Associate Judge, concurring:

While I agree with the majority's analysis in Section II, I write separately to clarify that in reversing the decision of the District of Columbia Office of Employee Appeals ("OEA"), this court is not engaging in credibility determinations properly left to the hearing examiner. In ruling against the hospital, OEA found that, viewing the record as a whole, the hospital had failed to prove dishonesty by a preponderance of the evidence. While professing to rely upon the correct legal standard, OEA actually placed a much higher burden of proof on the hospital. This is clear from the hearing examiner's discussion of the shortcomings of the hospital's case.

Here, the hospital presented a prima facie case of dishonest conduct by Gaines; Gaines cashed a money order which did not belong to her. Gaines then failed to rebut this showing. Her explanation as to how she came to possess the check was wholly incredible, and in fact, tended to reinforce the hospital's case. As a matter of law, therefore, we can say that the hospital should have prevailed.